## Case No. 10,830.

### PATTERSON v. TATUM.

[3 Sawy. 164.][1]

Circuit Court, D. California. Sept. 28, 1874.

FIVE HUNDRED THOUSAND ACRES GRANT TO STATE—COMMISSIONER OF LAND OFFICE, DUTIES—REPEALS BY REVISING ACTS — PRESUMPTION AS TO LAND TITLES IN CALIFORNIA — PATENT A GOVERNMENT CONVEYANCE.

1. The grant to the state by the act of congress of September 4, 1841 [5 Stat. 453], of 500,000 acres, is not of any specific land, but of a specific quantity to be selected under the direction of her legislature, in parcels conformably to the lines of the public surveys. out of any public land, excepting such as was then reserved, or might thereafter at the date of the selection be reserved from sale by any act of congress or proclamation of the president. When the selection and location are once made pursuant to the state's directions. of lands not reserved, but subject to location, the general gift of the quantity becomes a particular gift of the specific lands located, vesting in her a perfect and absolute title to the same; and that title passes by her patent. The patent takes effect by relation as of the date of the selection.
[Cited in Ison v. Nelson Min. Co., 47 Fed. 200; Los Angeles Farming & Milling Co. v. Hoff, 48 Fed. 344.]

2. The commissioner of the general land office is attached to the department of the interior, and acts under the direction and supervision of the head of that department in all matters respecting the public lands of the United States. The legislation of congress respecting his office stated.
[Cited in Snyder v. Sickles, 98 U. S. 210.]

3. The doctrine that a statute is impliedly repealed by a subsequent act revising the whole matter of the first, does not apply when the revisory statute itself prescribes its operation upon the previous act; when that is done no other effect can be given to the revisory act.
[Cited in Barden v. Wells, 14 Mont. 462, 36 Pac. 1077. Cited in brief in Bush v. District of Columbia, 1 D. C. App. 4. Cited in Gaston v. Merriam, 33 Minn. 284, 22 N. W. 614.]

4. All titles to land in California, except where the land is covered by tide-waters, or is acquired by accretion from the sea, come either from the United States or the government which preceded them. In the absence of proof that the title is obtained directly from the government, the legal presumption is that the title is in the United States. This presumption is not only one which would arise independent of any legislation, but it has been expressly declared by statute in that state.

5. A patent is the instrument by which the government, whether state or national, passes its title; it is the government conveyance. But if the government possesses at the time no title. that fact may be shown in an action of ejectment. The patent is evidence of title, only because government. being the original source of title, the presumption of law is that the title remained with the government until some other disposition of it is shown. A court of law is as competent to pass upon the question whether a title existed at the time in the government, as it is whether the title existed in an individual, where the grantor is a private party. The cases where a party must resort to a court of equity for relief against the operation of a patent stated.
[Quoted in Hayner v. Stanly, 13 Fed. 223.]
[Cited in Deno v. Griffin, 20 Nev. 249, 20 Pac. 309; Rose v. Richmond M. Co., 17 Nev. 70, 27 Pac. 1115.]

This was an action [by John D. Patterson against Thomas J. Tatum] to recover the possession of a parcel of land situated in the county of Stanislaus, and was tried by the court, before Mr. Justice FIELD, without the intervention of a jury, by stipulation of the parties. The court found for the defendant.

George A. Nourse, for plaintiff.

C. T. Botts and D. S. Terry, for defendant.

FIELD, Circuit Justice. This is an action for the possession of certain real property situated in Stanislaus county in this state. The plaintiff claims title to the demanded premises under a patent of the state of California, bearing date February 14, 1871, issued upon a selection of the premises as part of the five hundred thousand acres donated by the act of congress of September 4, 1841.

The selection was made by the locating agent of the state for the Stockton district, with that of other lands, on the first of May, 1868. A list of the selections was on that

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

day filed by the agent in the United States land office at Stockton. This list was approved by the commissioner of the general land office on the sixteenth of October, 1871, and by the secretary of the interior on the eighteenth of the same month. The title of the plaintiff rests upon the validity of this selection.

The selection covered nine hundred and sixty acres, and objection was taken to the validity of the patent, on the ground that the statute of the state at the time prohibited the purchase of more than three hundred and twenty acres by one person. From the views we take of this case, it is unnecessary to pass upon this objection. We, therefore, refrain from expressing any opinion upon it.

The grant to the state by the act of congress of September 4, 1841, is not of any specific land, but of a specific quantity to be selected under the direction of her legislature, in parcels conformably to the lines of the public surveys, out of any public land, excepting such as was then reserved, or might thereafter at the date of the selection be reserved from sale by any act of congress or proclamation of the president. When the selection and location, as is said in Doll v. Meador, 16 Cal. 320, "are once made pursuant to her (the state's) directions, of lands not reserved, but subject to location, the general gift of the quantity becomes a particular gift of the specific lands located, vesting in her a perfect and absolute title to the same; and that title passes by her patent." But whilst affirming the correctness of this adjudication, we add to it what is equally obvious, that when the selection and location are of lands which are reserved from sale and are not subject to location, no title vests in the state, and, of course, none passes by her patent.

The state patent takes effect, by relation, as of the date of the selection, May 1, 1868. The defendant contends, that on that day the lands selected were reserved from sale by acts of congress passed in 1862 and 1864, and proceedings taken under them. And he produces directions of the land department, to show that the premises had been withdrawn from sale under those acts. Two questions are thus presented, one of fact, whether the lands were thus reserved; the other of law, whether, such being the case, the defendant can set up the fact in this action to defeat the plaintiff's recovery.

First, as to the question of fact. By Act July 1, 1862, § 3 (12 Stat. 493), congress granted to the Central Pacific Railroad Company, for the purpose of aiding in the construction of a railway and telegraph line across the continent, alternate sections, designated by odd numbers, of public land on each side of the road to the extent of ten miles, subject to certain exceptions; and provided that within two years after the passage of the act, the company should designate the general route of its road, as near as might be, and file a map of the same in the department of the interior, and that thereupon the secretary of the interior should cause the odd sections within fifteen miles of the designated route to be withdrawn from pre-emption, private entry and sale.

Act Cong. July 2, 1864, §§ 4, 5 (13 Stat. 358), amending the first act, increased the grant, so as to include the alternate odd sections to the distance of twenty miles on each side of the road, and extended the time for designating the general route of the road, and filing a map of the same one year beyond the original period, and increased the distance within which the lands should be withdrawn from pre-emption, private entry and sale, when such route was designated and map filed, to twenty-five miles.

The act of 1862 authorized the construction by the Central Pacific Railroad Company of a road and telegraph line from the Pacific coast, at or near San Francisco, or the navigable waters of the Sacramento, to the eastern boundary of California, on the same terms and conditions upon which the construction of a road and telegraph line was authorized beyond that boundary. The right to construct the road and telegraph line from the city of San José to the city of Sacramento, and all the privileges and benefits which the company had acquired under the acts of congress were, previous to March 3, 1865, assigned by the company to the Western Pacific Railroad Company, a corporation also created under the laws of California, and on that day the assignment was ratified and confirmed by act of congress. 13 Stat. 504.

On the twenty-third of November, 1864, the commissioner of the general land office at Washington sent a communication, purporting by its heading to issue from the department of the interior, directed to the register and receiver of the land office at Stockton, informing those officers that he inclosed a diagram showing that part of their district embraced within the twenty-five-mile limit of the Central Pacific Railroad, and directing them "to reserve from sale, location, or claims of any kind, the vacant odd sections and parts of sections" within those limits, as shown by that map.

On the twenty-third of December following, the commissioner sent a second communication, also purporting to issue from the department of the interior, to the same officers, referring to the previous one of November 23d as transmitting a diagram of the route of the Central Pacific Railroad, east from Sacramento city, which passed through their district, and added that he then transmitted a diagram of that part of the western division of the road, which was within their district, and that the line of the road and the twenty-five mile limit were indicated by

red lines, and informing the officers that the previous instructions sent on the twenty-third of November, as to withholding the public lands from sale within the twenty-five-mile limit of the road eastward, were applied to the western division of the road, and that they would be governed accordingly.

This diagram was received by the register of the land office at Stockton, on the thirty-first of January, 1865. A certified copy is in evidence, and it is admitted that the premises in controversy are odd sections within the twenty-five-mile limit, as designated thereon. The indorsements show that it was made from a map dated October 6, 1854. That map must, of course, have been in the department of the interior, as the diagram came from that quarter. It shows on its face the general route of the Pacific Railroad in the western district. Examined in connection with the communication of the commissioner of the general land office, the conclusion is irresistible that a map of the general route of the railroad company was filed in the department of the interior by the Pacific Railroad Company, as required by the act of congress, and that it was accepted and acted upon by the secretary of the interior in the communication to the register and receiver of the Stockton district.

The position that the communication of the commissioner of the general land office must be treated as the separate act of the commissioner, and not as the act of the secretary, is not tenable. The statute provides that the secretary of the interior, when a map of the route of the road is filed, "shall cause" the lands within the prescribed limits to be withdrawn. It does not require the act of withdrawal to be personally made by the secretary; the law is complied with if the withdrawal be made by his department; that is, through the officers acting under his general supervision and control. The commissioner of the general land office is attached to the department of the interior, and acts under the direction and supervision of the head of that department in all matters respecting the public lands of the United States. The act of April 25, 1812 (2 Stat. 716), establishing the general land office, put the office in the department of the treasury, and placed the commissioner under the direction of the head of that department. The act of July 4, 1846 (5 Stat. 107), reorganizing the office, provided that the executive duties prescribed by law respecting the public lands should be subject to the supervision and control of the commissioner, under the direction of the president. But the office still continued a part of the department of the treasury; and as the president acts in matters belonging to the departments through their respective heads, the immediate supervision over and direction of the commissioner remained with the secretary after, as previous to, the reorganization.

The proposition of counsel that a statute is impliedly repealed by a subsequent act revising the whole matter of the first, is, undoubtedly, correct. The authorities are numerous to that effect. Two cases recently decided by the supreme court of the United States, in addition to those cited by counsel, establish this position; that of U. S. v. Tynen, 11 Wall. [78 U. S. 88], and that of Henderson's Tobacco, Id. 652. But the implication cannot arise when the revisory statute itself prescribes its operation upon the previous act; when that is done, no other effect can be given to the revisory act. And such was the case in the revisory act of 1846. It repeals such provisions of the original act as were inconsistent with the new act—none other. The continued direction of the commissioner and supervision over him by the secretary of the treasury, acting as in all other cases under the president, as prescribed by the original act, was not inconsistent with anything in the new act. And such was the understanding and practice of the treasury department, until the department of the interior was established in 1849, when the land office was transferred to that department, and its secretary was required to "perform all the duties of supervision and appeal" in relation to that office, which had been previously discharged by the secretary of the treasury.

The position of counsel that there is no evidence that the odd sections covered by the patent of the defendant were vacant at the time of the reservation in 1865, and therefore they cannot be so regarded in this action, is not entitled to any consideration. If the selections were not then vacant, they were not vacant in 1868, when selected by the locating agent of the state. All titles to land in California, except where the land is covered by tide-waters, or is acquired by accretion from the sea, come either from the United States or the government which preceded them. In the absence of proof that the title is obtained directly from the government, the legal presumption is that the title is in the United States. This presumption is not only one which would arise independent of any legislation, but it has been expressly declared by statute in that state.

Our conclusion from the evidence is, that the land embraced by the patent to the plaintiff was reserved from sale when selected by the locating agent, as part of the five hundred thousand acres granted to the state, and that such selection was inoperative and void. The approval of the commissioner of the land office and of the secretary of the interior, of the list of selections, so far as the list embraced the premises in controversy, was equally inoperative. No interest by either proceeding was vested in the state. This result would follow without any legislation to that effect, from the condition annexed to the grant, that the selection must be made from lands not reserved from sale by any law of congress or proclamation of

the president; but, as if to preclude any possible discussion upon the question, the act of congress of August 3, 1854, providing for vesting the title in the states, of lands certified to them, declares that in all cases where lands are granted by any law of congress to any state or territory, and the law "does not convey the fee simple title of such lands, or require patents to be issued therefor," the lists of such lands certified by the commissioner of the general land office, where the lands are not of the character embraced by the acts of congress, and are not intended to be granted thereby, shall, so far as such lands are concerned, "be perfectly null and void, and no right, title, claim, or interest, shall be conveyed thereby." 10 Stat. 346.

The donating act of 1841 does not convey the fee simple title to any specific lands, or require patents to be issued therefor; it only vests an immediate right to a specific quantity to be afterwards selected under direction of the state. And should the selection be postponed until after the land is reserved or otherwise appropriated, the interest of the state would lapse and fail. The lands donated to the state are precisely those to which the act of congress refers when it declares the effect of the list certified by the commissioner.

Second. The lands selected by the agent of the state having been at the time of the selection thus reserved from sale, and the selection being therefore void, the second question arises, whether the defendant can set up this fact to defeat the plaintiff's recovery on the state patent. The defendant claims title to the demanded premises under patents of the United States, bearing date in March, August, and September, 1873, issued to different parties upon pre-emption settlements made by the patentees on the fifth of July, 1870. On that day the reservation from sale by the proceedings already detailed, was withdrawn, and the lands were opened to pre-emption and homestead entries. The defendant claiming under the patents thus issued, has a standing in a court of law, and occupies a position with respect to the property which enables him to assail the title of the plaintiff. The case of Doll v. Meador, to which the counsel refers, and upon which he relies to show that the title of the plaintiff cannot be questioned in this action, is a very different case from the one at bar. There the controversy was between the holder of a patent of the state, and a trespasser without title; and it was held that the latter not being in privity with a common or paramount source of title, was in no position to question the validity of the patent, or the action of the officers of the state by whom the lands were selected. We adhere to every position asserted in that case respecting the efficacy of patents and the conditions upon which they may be assailed. We have had frequent occasions during a somewhat extended judicial experience, to reconsider the doctrines there stated,

and upon every reconsideration we have felt renewed confidence in their soundness. But they cannot be applied to a case entirely dissimilar in its facts, where the assailant of the plaintiff's patent comes clothed with a patent of the United States, of equal dignity, and equally entitled to every presumption in favor of its validity.

A patent is the instrument by which the government, whether state or national, passes its title; it is the government conveyance. But, if the government possess at the time no title, none passes by its execution. It is of itself evidence of title, only because government being the original source of title, the presumption of law is that the title remained with the government until some other disposition of it is shown. But, if an earlier patent is produced, the subsequent one ceases to have any operation. The title passing by the first conveyance is not affected by the second until the first is got out of the way. If the first was issued from improper motives, corrupt actions, erroneous views of duty, or mistaken considerations, as to matter of fact or law by the officers of the government to whom the execution and issue of patents are intrusted, a court of law can afford no remedy to the second patentee; he must resort to a court of equity for relief. So, also, if particular facts respecting the condition or location of the property must be previously ascertained and determined by a special tribunal appointed for that purpose, and that tribunal has come to erroneous conclusions upon which the patent has issued, such conclusions cannot be questioned collaterally, and the patent be thereby invalidated in the action of ejectment. Relief in such cases can only be afforded by a direct proceeding by bill, information, or scire facias, either to revoke the first patent, or restrain its operation, or to subject, where equitable grounds exist, the land to certain trusts in the first patentee's hands. A court of law in an action of ejectment cannot listen to any objections founded upon such considerations. But where the action of the officers in the execution and issue of the patent, or the correctness of the conclusions of the special tribunal is not assailed, but the objection to the patent reaches beyond such action and conclusions, and goes to the existence of a subject upon which such officers or tribunal could act, that is, to the title in the grantor, no such difficulty exists in its consideration in a court of law. That tribunal is as fully competent to pass upon the question whether a title existed at the time in the government, as it would be whether the title existed in an individual where the grantor is a private party.

In Polk's Lessee v. Wendall, 9 Cranch [13 U. S.] 87, the question was considered as to how far in a court of law inquiries tending to impeach a patent could be considered, and it was observed that the laws for the sale of public lands were intended to secure the regularity of grants, and to protect the incipient

rights of individuals and the state from imposition; that officers were appointed to superintend the business, and rules had been framed prescribing their duty, and that when all the proceedings were completed by a patent, a compliance with the rules was presupposed. It would, therefore, be extremely unreasonable, said the court, to avoid a grant for any irregularity in the conduct of officers appointed by government to supervise the progressive course of a title, from its commencement to its consummation in a patent; but that the great principles of justice and law would be violated, did there not exist some tribunal to which an injured party might appeal in which the means by which an elder title was acquired, might be examined, and that in general a court of equity was a tribunal better adapted for the purpose than a court of law. "But," adds the court, "there are cases in which a grant is absolutely void, as where the state has no title to the thing granted, or where the officer had no authority to issue the grant. In such cases the validity of the grant is necessarily examinable at law." In Patterson v. Winn, 11 Wheat. [24 U. S.] 381, the supreme court refers to this case, and after giving a brief summary of the positions we have stated, says: "We may therefore, assume, as the settled doctrine of this court, that if a patent is absolutely void upon its face, or the issuing thereof was without authority, or was prohibited by statute, or the state had no title, it may be impeached collaterally in a court of law, in an action of ejectment. But, in general, other objections and defects complained of must be put in issue, in a regular course of pleadings, on a direct proceeding to avoid the patent."

This doctrine was recognized in Doll v. Meador. The court, after referring to a previous case, and observing that a patent issued by the government for any land not embraced in the grant to the state, would, undoubtedly, be void, for want of power to convey, said: "We do not question this proposition; we affirm it as sound. The point here is, as to the status of the party who can raise any question as to its validity, when it is regular on its face. Nor do we question the further proposition, that the defendant might have disproved the evidence of title furnished by the patent, by showing that the land in question was not included in the act of congress, or was within the exceptions contained in the act of this state. We only annex to the proposition the qualification, that to do this, he must first have brought himself in some privity with the common source of title. If he was a mere intruder, not possessing any claim of title, either from the general or state government, he would not be in a position to question the regularity and correctness of the action of the officers of the state, in the selection of the lands or the issuance of the patent."

Nor is there anything in the language of the court, in Leese v. Clark, 18 Cal. 535, which militates against these decisions. There a patent issued upon a confirmation of a Mexican grant, was under consideration. The United States had stipulated, in the treaty by which California was acquired, to protect its inhabitants in their property, and, in the execution of the obligation thus created, had established a special tribunal to examine all claims to property which parties asserted they possessed upon the transfer of jurisdiction from the former government. Numerous proceedings were required to be taken before this tribunal and in execution of its decrees, and where its adjudication was favorable to the claimant, a patent was directed to be issued to him. A patent thus resting upon the judgment of a special tribunal was something more than an ordinary conveyance of the government. It was an official declaration that the grant to the claimant was of such a character at the date of the cession of the country, that it was entitled to recognition and confirmation by the United States. And so the court very justly used the language which counsel cites, that upon all matters of fact and law, essential to authorize its issue, the patent imported absolute verity. And what were those matters of fact and law? These only; that the claimant had a valid grant at the date of the cession, that is, a genuine grant issued by the former government, which was entitled to confirmation under the treaty and the laws made to carry its stipulations into effect, and that by subsequent proceedings the claim of the grantee had been definitely located by an official survey. The whole proceeding resulting in the patent was one between the government and the claimant; it bound them until vacated by direct proceedings instituted for that purpose, and, of course, all parties in privity with either by title subsequent. But, if before the grant thus confirmed had issued, the title had passed from the Mexican government, the patent notwithstanding all the formality of the various steps preceding its issue, would have created no interest in the patentee. Such previous transfer of title, supposing always that the transfer had been judicially recognized and confirmed, could be set up in an action at law against the patent, without assailing the regularity of the proceedings of the land commissioner, or of the officers of the United States, in the survey and location of the land. Such previous transfer being established, would not make the patent void, but, like a prior conveyance of the same property, would render it inoperative.

We do not think the judgment in the previous action between the same parties can be deemed an adjudication estopping the defendant from setting up his title and questioning the validity of the plaintiff's patent. When the first action was tried the defendant had not acquired the title of the government by his patent, and was therefore in no posi-

PATTON (Case No. 10,832)　　　　　　　　　　[18 Fed. Cas. page 1336]

tion to assail the plaintiff's patent. Such, at least, was the ruling of the court, which must be regarded, whether correct or otherwise, as the law of that case.

It follows, from the views we have expressed, that the law is with the defendant, and judgment must therefore pass in his favor; and it is so ordered.