[No. 12475. In Bank. — May 30, 1891.]

## KATE D. McLAUGHLIN, EXECUTRIX, ETC., APPELLANT, *v.* PETER MENOTTI, RESPONDENT.

RAILROAD GRANT — CONSTRUCTION — GRANT IN PRÆSENTI — LOCATION OF ROAD — TITLE TO ODD SECTIONS. — The act of Congress of July 1, 1862, granting to the railroad company organized under its provisions certain odd sections of land, to be afterwards located, passed to the company a present interest in the lands to be designated within the limits therein specified, and upon the location of the route to be established, the grant became specific and attached itself to every odd-numbered section.

ID. — FILING OF MAP OF ROUTE — WITHDRAWAL OF LANDS FROM SALE. — Under section 7 of the act of Congress of July 1, 1862, providing that the railroad company shall designate the general route of the road as near as may be, and shall file a map of the same in the department of the interior, and that the Secretary of the Interior shall thereupon cause the lands to be withdrawn from pre-emption, private entry, and sale, the filing of the map and an order of the Secretary withdrawing the lands precluded the acquisition or initiation of any right, other than that of the company, in any of the odd-numbered sections of land.

ID. — DATE OF OPERATION OF GRANT — ADVERSE CLAIM BEFORE WITHDRAWAL OF LANDS. — Under section 7 of the act, the route of the railroad was definitely settled so that the grant attached, when a map, approved by the directors, designating the route of the proposed road, was filed with the Secretary of the Interior, and no adverse right could be initiated between the time it was so filed and the time when the notice of the order withdrawing the lands was received at the local land-office.

ID. — APPLICATION FOR PURCHASE OF SCHOOL-LAND — SURVEY — WITHDRAWAL FROM SALE BEFORE FILING OF MAP. — An application for the purchase of school-lands, and approval thereof by the state locating agent, made before the survey of the lands, is void; and the fact that the application for the purchase was on file when the agent of the state made application to the United States land-officers to locate the land, one day after the official map of the township had been filed by the surveyor-general, did not make the application or location valid, where it appears that prior thereto the lands had been withdrawn from sale by the Secretary of the Interior as having been granted to the railroad company.

ID. — JURISDICTION OF LAND DEPARTMENT — LISTING OF GRANTED LAND TO STATE — EJECTMENT BY RAILROAD COMPANY — EVIDENCE. — The lands having been disposed of to the railroad company, the land department had no jurisdiction to transfer them, and its listing thereof to the state was inoperative and void; and the facts showing such invalidity are admissible in an action of ejectment by the grantees of the railroad company against a defendant claiming under the state.

ID. — ACT OF 1866 TO QUIET LAND TITLES — EFFECT UPON GRANTED LANDS — VESTED RIGHTS. — The confirmatory act of July 23, 1866, does not apply to lands withdrawn from sale; but conceding that it does, it would

be a nullity as to the lands granted and withdrawn from sale under the Pacific railroad acts. Congress could not, after the company had accepted the terms of the acts of 1862 and 1864, and acted upon them, divest it of its right in the lands.

ID. — RESERVATION OF "LAWFUL CLAIM" — COMPLIANCE WITH LAWS. — One who has simply entered upon public land and improved it, without complying with the laws providing for the acquisition of the title, is not possessed of a "lawful claim" with the meaning of section 4 of the act of Congress of July 2, 1864, reserving from its operation any pre-emption, homestead, swamp-land, or other "lawful claim."

ID. — BONA FIDE SETTLER — QUESTION OF FACT — FINDINGS — OMISSION OF ULTIMATE FACT — NEW TRIAL. — The question whether a prior settler upon lands included within the grant to the railroad company is a *bona fide* settler, within the meaning of the act of 1864, is a question of fact; and the failure of the court to find the ultimate fact of a *bona fide* settlement in an action of ejectment, where such a settlement is relied on by the defendant to defeat the title of the railroad company, leaves the question as to which party has the better title uncertain and unsettled, and is error entitling the defendant to a new trial.

ID. — PROOF OF GOOD FAITH — COMPLIANCE WITH LAW — VALID CLAIM. — A party who has entered upon public land to acquire the title from the government as a *bona fide* settler prior to the railroad grant must show his good faith by diligently complying with the requirements of the law under which he expects to secure the title, and must be entitled to initiate a valid claim under the law.

APPEAL — DISMISSAL — LAPSE OF TIME. — An appeal from a judgment taken more than six years after the entry of the judgment will be dismissed.

APPEAL from a judgment of the District Court of the city and county of San Francisco.

The facts are stated in the opinion of the court.

*A. L. Rhodes,* for Appellant.

The terms of the grant, that "there be and is hereby granted," etc., vested a present title, though a survey of the lands and a location of the road were necessary to give precision to it, and attach it to any particular tract. (*Leavenworth R. R. Co.* v. *United States,* 92 U. S. 741.) The act of 1864 is to be construed as a part of the act of 1862, and as if passed at the same time. (*Missouri etc. R. R. Co.* v. *Kansas P. R. R. Co.,* 97 U. S. 491.) The definite location of the line of the road identifies the odd-numbered sections or subdivisions of sections which lie within the

limits of twenty miles on each side of the definite line of the railroad, and thereupon the title passes to the railroad company. (*Van Wyck* v. *Knevals*, 106 U. S. 364; *Walden* v. *Knevals*, 114 U. S. 374; *Kansas Pac. R. R. Co.* v. *Dunmeyer*, 113 U. S. 629; *Barney* v. *Winona etc. R. R. Co.*, 117 U. S. 232.) The patent to the railroad company takes effect, by relation, as of the date of the passage of the Pacific railroad act. (*Missouri etc. R'y Co.* v. *Kansas Pac. R'y Co.*, 97 U. S. 495; *Winona etc. R. R. Co.*, v. *Barney*, 113 U. S. 626.) The odd-numbered sections within the limits of the lands withdrawn were not subject to pre-emption, etc., and the even-numbered sections were not subject to pre-emption prior to the act of March 6, 1868 (15 Stats. 39), unless the line of the road had before that time been definitely located. (*Morrison* v. *Stalnaker*, 104 U. S. 213.)

*Laine & Hatch*, for Respondent.

The grant is to be construed strictly as against the grantee, and liberally in favor of the grantor. Nothing passes to the grantee except that which is granted in clear and express terms. (*Leavenworth etc. R. R. Co.* v. *United States*, 92 U. S. 740; *Newhall* v. *Sanger*, 92 U. S. 761.) The question as to whether the land was vacant at the time the line of the railroad was definitely fixed, and the question as to whether there were improvements of a *bona fide* settler on them, etc., and the question as to whether the state had made selection of the land in proper manner, were all questions of fact within the jurisdiction of the land-office, and its decision thereupon was conclusive. (*Wilkinson* v. *Merrill*, 52 Cal. 426; *Hosmer* v. *Wallace*, 47 Cal. 461; *Moore* v. *Robbins*, 96 U. S. 535.) The right of the railroad company to claim land as against private persons did not attach until the line of the road was definitely fixed. (*Missouri etc. R. R. Co.* v. *Kansas Pacific R. R. Co.*, 97 U. S. 498, 499; *Schwerin* v. *W. P. R. R. Co.*, Copp's Public Land

Laws, 1875, p. 409.)   A patent issued without authority of or against law may be attacked in an action at law by any one in privity with the United States. (*Rosecrans* v. *Douglass*, 52 Cal. 216; *Rice* v. *Railroad*, 1 Black, 375; *Sherman* v. *Buick*, 93 U. S. 209; *Morton* v. *Nebraska*, 21 Wall. 674 and *Huff* v. *Doyle*, 93 U. S. 558.)

PATERSON, J.—This is an action of ejectment. The complaint is in the usual form, and the answer is a general denial.

The plaintiff claims title under a patent from the United States to the Central Pacific Railroad Company issued April 3, 1872, and a deed from that company to plaintiff's testator dated April 3, 1873. The defendant claims under a patent from the state of California dated February 25, 1875.

The facts, which are not disputed, are, in substance, as follows: In 1858, when the land was unoccupied public land of the United States, Philip Hirleman settled on the land and built thereon a dwelling-house, fences, and corrals, cultivated a portion of it, and remained in possession until he conveyed to one Jean Peter, March, 1866; the latter went into possession of the land and held the same until it was conveyed by him to the defendant herein, March 29, 1867. On June 13, 1864, Hirleman applied to the locating agent of the state to locate the land in controversy under the provisions of the act of the legislature of April 27, 1863, entitled "An act to provide for the sale of certain lands belonging to the state," as a lieu school-land location; this application was in due form, and accompanied by the affidavit of loyalty, and was accepted on the sixteenth day of June, 1864. At some time prior to January 30, 1865 (the exact date is not found), the Western Pacific Railroad Company filed a map in the office of the Secretary of the Interior, designating the general route, and a copy of this map was received at the land-office in San

Francisco on the thirtieth day of January, accompanied by the proper order to the register and receiver, withdrawing the odd-numbered sections, including the lands in controversy, from pre-emption, private entry, and sale. The official map of the township was filed by the United States surveyor-general in the local land-office on February 27, 1865. The assignment which the Central Pacific Railroad Company had made and executed in 1864 to the Western Pacific Railroad Company of its right to the land in controversy was affirmed by the act of Congress of March 3, 1865. On February 28, 1865, the state's agent located in lieu of a portion of the school-lands of the state which had been lost the land in controversy, at the request and for the use of Hirleman, by filing an application for the same in the name of the state in the United States land-office at San Francisco; and the location so made was filed in the state land-office on the fourth day of April, 1865, and was approved by the surveyor-general of the state May 13, 1865. On June 24, 1865, Hirleman made payment to the treasurer of the twenty per cent of the purchase-money, and one year's interest on the balance, as required by law; and on the thirty-first day of August, 1865, a certificate of purchase for the land was issued to him by the state. The line of the Western Pacific Railroad Company was definitely located not earlier than the first day of September, 1866. On June 22, 1870, the two railroad companies referred to were consolidated under the name of the Central Pacific Railroad Company. On March 13, 1872, the defendant applied to the officers of the United States land department for a confirmation of the right of the state to the land, under the provisions of the act of Congress entitled "An act to quiet land titles in California," approved July 23, 1866; the Western Pacific Railroad Company and parties claiming under it were notified, and after proceedings had in the department, the commissioner of the general

land-office, under the direction of the Secretary of the Interior, on May 15, 1874, listed over and certified to the state the land as confirmed to the state of California. A patent of the lands issued from the United States to the Central Pacific Railroad Company, April 3, 1872, and on April 3, 1873, the company conveyed the land to the plaintiff. On December 31, 1874, full payment was made to the state by Hirleman, and on February 25, 1875, he received from the state a patent of the same.

The question is, Upon these facts, which party has the better title? The defendant claims that the act of Congress to quiet land titles in California, passed July 23, 1866, confirmed the state location, and granted the land in controversy to the state and her assigns, the state having, prior to the passage of the act, and prior to the definite location of the line of the road, made a selection of the land, in lieu of school-lands which had been lost, and disposed of the same to defendant, who purchased it in good faith; that the patent to the railroad company is void as to the land in controversy, because at the time the grant to the company took effect the land had been "otherwise disposed of by the United States," within the meaning of section 3 of the act of July 1, 1862.

These contentions are the logical result of the defendant's erroneous views as to the operation and effect of the Pacific railroad acts of July 1, 1862, and July 2, 1864. Although the amendatory act of 1864 enlarged the grant of 1862, it was done in such a way as to give the same operation and effect to the grant of the enlarged quantity as if it had been included in the provisions of the original act, and there is no longer any question as to the operation and effect of the act of 1862. Referring to a similar grant, the supreme court of the United States, in *Leavenworth etc. R. R. Co.* v. *United States*, 92 U. S. 741, said: "'There be and is hereby granted' are words of absolute donation, and import a

grant *in præsenti*. . . . . They vest a present title in the
state of Kansas, though a survey of the lands and a loca-
tion of the road are necessary to give precision to it, and
attach to it any particular tract." In *Missouri etc. R'y Co.*
v. *Kansas Pac. R'y Co.*, 97 U. S. 491, Mr. Justice Field, de-
livering the opinion of the court, considered very care-
fully the purposes of the act of 1862, of the amendatory
act of 1864, and the nature and effect of the grant, and
said: "The act of July 1, 1862, passed to the company a
present interest in the lands to be designated within the
limits there specified. Its language is, 'that there be and
is hereby granted' to it the odd sections mentioned, —
words which import a grant *in præsenti*, and not one *in
futuro*, or the promise of a grant. . . . . The grant was of
sections to be afterwards located, and their location de-
pended upon the route to be established; when that was
settled, the location became certain, and the title that
was previously imperfect acquired precision, and at-
tached to the lands."

Section 7 of the act of July 1, 1862, provides that the
"said company shall designate the general route of said
road as near as may be, and shall file a map of the same
in the department of the interior, whereupon the Sec-
retary of the Interior shall cause the lands . . . . to be
withdrawn from pre-emption, private entry, and sale."
This map was filed in the office of the Secretary of the
Interior prior to January 30, 1865, and on the day last
named a copy thereof was filed in the United States land-
office at San Francisco, with an order of the Secretary
withdrawing the lands from pre-emption, private entry,
and sale. The purpose of this requirement and the
effect of the withdrawal are to preclude the acquisition
or initiation of any right other than that of the com-
pany in any of the odd-numbered sections of land until
the line of the road has become definitely fixed, and
when so definitely fixed the grant becomes specific by
attaching itself to every odd-numbered section. If,

therefore, Hirleman had no lawful claim at the time of the withdrawal,— which at the latest was January 30, 1865,— he never had any, for he could not acquire or initiate any thereafter. (*Buttz* v. *N. P. R. R. Co.*, 119 U. S. 55; *Van Wyck* v. *Knevals*, 106 U. S. 360.) In those cases the court held, giving convincing reasons therefor, that the route is definitely fixed so that the grant attaches when a map, approved by the directors, designating the route of the proposed road, is filed with the Secretary of the Interior, and that no right could be initiated between the time it was so filed and the time when notice of the order was received at the local land-office.

Hirleman's application to the state locating agent was made and accepted in June, 1864. At that time the lands were unsurveyed, and the application and approval were therefore void. (*Collins* v. *Bartlett*, 44 Cal. 380.) It is true, the application was on file when the agent made application to the United States land-officers to locate the land,— February 28, 1865, one day after the official map of the township had been filed by the surveyor-general,— but this did not make the application or location valid. The lands had been withdrawn by the Secretary, and thereafter no right of any kind could attach to the lands through any act of the state or its agent. On January 30, 1865, if not before, the company's grant attached in such a manner that its indefeasible right to the land depended only upon the filing of the map of definite location and the completion of the road. For the same reasons the decision of the officers of the land department in approving and listing the land to the state was void. The title had passed to the company before the listing. The definite location of the line of the road identified the odd-numberd sections within the limits of twenty-five miles on each side of the road, and the patent to the company took effect by relation as of the date of the passage of the act of July 1, 1862. (*Missouri etc. R'y Co.* v. *Kansas Pac. R'y*

*Co.,* 97 U. S. 491.) The application to the land department for confirmation under the act of July 23, 1866, was made on March 13, 1872. The land had passed out of the public domain several years prior to that time, and the grant thereof to the company could not be divested or in any manner limited by the action of the officers of the land department.

It is claimed by respondent that the question as to whether the land was subject to selection by the state was a question of fact within the jurisdiction of the land department, and that its decision cannot be attacked in this action. In *Smelting Co.* v. *Kemp,* 104 U. S. 641, the court held that if the lands had been previously disposed of, or if Congress had made no provision for their sale, or had reserved them, the department would have no jurisdiction to transfer them, and its attempted conveyance would be inoperative and void, no matter with what seeming regularity the forms of law may have been observed. In establishing any of these particulars the judgment of the department upon matters properly before it is not assailed; its authority to act at all is denied, and shown never to have existed. (*Wright* v. *Roseberry,* 121 U. S. 519; *Doolan* v. *Carr,* 125 U. S. 618.) The act of August 3, 1854, provides that if the lists embrace lands not granted to the state or territory, " said lists, so far as these lands are concerned, shall be perfectly null and void, and no right, title, claim, or interest shall be conveyed thereby." (10 U. S. Stats. 346.)

The confirmatory act of July 23, 1866, did not give to defendant's claim any additional assurance. There is nothing in that act indicating an intention on the part of Congress to make its provisions applicable to any lands which had been withdrawn from sale; and if there were, it would be a nullity so far as the lands granted and withdrawn from sale under the Pacific railroad acts are concerned, for Congress could not, after the company had accepted the terms of the acts of 1862 and 1864, and

acted upon them, divest the company of its right in the lands.

Some of these questions have been considered recently in the United States circuit court, ninth circuit. In a thorough and elaborate opinion by Judge Sawyer, Justice Field concurring, the decisions of the national courts, and the provisions of the several acts of Congress bearing on the subject were carefully reviewed, and the conclusions reached which we have expressed above. (*United States* v. *Curtner*, 38 Fed. Rep. 1.)

Section 4 of the act of July 2, 1864, provides that "any land granted by this act, or the act to which this is an amendment, shall not defeat or impair any pre-emption, homestead, swamp-land, or other lawful claim, nor include any government reservation or mineral land, or the improvements of any *bona fide* settler, or any lands returned and denominated as mineral lands, etc." Defendant insists that if the lands were not "otherwise disposed of by the United States" (sec. 3, act of July 1, 1862), through the selection made by the state, he acquired at least a "lawful claim," and became a "*bona fide* settler," within the meaning of those words, by the listing over to the state and by operation of the act of July 23, 1866, and therefore the patent to the company was issued without authority of law, and is void.

The language of the act shows that the "other lawful claim" referred to is a claim which has become in some way so connected with the paramount source of title as to be recognized as a claim by the laws of the United States. A pre-emption claim is a lawful claim, because regularly initiated under the laws of the country; so are homestead and swamp-land claims; and the *other* lawful claim referred to must be of equal dignity and force. "Lawful claim" would include a Mexican grant, or the claim of the state to lands granted to it after selection of the lands and before patent; but one who has simply

entered upon a parcel of public land, and improved it, without complying with the laws providing for the acquisition of the title, cannot be said to be possessed of a "lawful claim." (*Western Pac. R. R. Co.* v. *Tevis,* 41 Cal. 494.)

Was the defendant a "*bona fide* settler"? Counsel for appellant said at the argument that the act as enrolled reads, "or the improvements of a *bona fide* settler on any lands returned and denominated as mineral lands, etc.," but assumed that the court would be bound to read it as printed in the volumes of the United States Statutes at Large, and that if the defendant was a *bona fide* settler at the time the land was withdrawn from sale by the Secretary of the Interior, the judgment of the court below should be affirmed. We consider the case from this stand-point.

No case was referred to, nor have we been able to find one, in which the words "*bona fide* settler" have been construed. We think, however, that they must refer to one who has done something more than merely occupy the land and put a few improvements upon it; and that is all the court has found here. It cannot be said that every one who enters upon land and builds a fence and a cabin or a house is a *bona fide* settler. If Congress had intended to exclude from the grant all lands upon which there were settlers having improvements, without regard to the question whether their entry and possession were lawful, it is not likely that it would have employed the term "*bona fide.*" Some effect must be attributed to those words. There certainly must be shown an intention in good faith to proceed diligently to comply with the laws and acquire title. Appellant contends it must be shown that the settler entered upon the land for the purpose of acquiring title thereto from the government, and that he possessed the necessary qualifications to entitle him to connect his claim with the paramount source of title, and in support of his con-

tention cites the case of *United States* v. *Central P. R. R. Co.*, No. 4217, recently decided in an oral opinion by Judge Sawyer in the United States circuit court. There appears to be sound reason in the contention, but the exigencies of the case before us do not require us to hold that it must always be shown that the settler was twenty-one years of age, or the head of a family, or had served the requisite time in the army or navy, and that he was a citizen of the United States, or had declared his intentions to become such. The question whether a settler is a *bona fide* settler is one of *fact*. In this case the ultimate fact is not found. Hirleman went upon the land and made improvements thereon in 1858, seven years prior to the time the land was reserved from sale, but for what purpose it is not found, except inferentially. Whether he was possessed of the qualifications necessary to enable him to initiate a valid claim is not found. It is true, it was in the power of Congress to exempt from the grant to the companies lands occupied by aliens, and that the legislation of Congress has been very liberal in enabling them to qualify themselves to acquire title to the public lands, — perhaps too liberal, — but it has never been the policy of the government to encourage settlement without an intention on the part of the settler in good faith to proceed diligently in all the steps necessary to be taken in order to obtain the title. The facts that a settler has occupied and improved the land are merely evidentiary matters. Good intentions alone, added to settlement and improvements, will not establish the ultimate fact. A party who has entered upon public land to acquire the title from the government must show his good faith by diligently complying with the requirements of the law under which he expects to secure the title. (*Mott* v. *Hawthorn*, 17 Cal. 58; *Western Pac. R. R. Co.* v. *Tevis*, 41 Cal. 494.) The evidence fails to show that the defendant has done so.

The failure of the court to find the ultimate fact re-

ferred to left the question as to which party has the better title uncertain and unsettled, and entitled the plaintiff to a new trial.

The appeal from the judgment was taken more than six years after the entry of the judgment. It is therefore dismissed. (*Langan* v. *Langan, ante,* p. 186.)

The order appealed from is reversed.

McFarland, J., Garoutte, J., and Harrison, J., concurred.

De Haven, J., concurring. — I concur in the judgment. There is no finding in this case of the ultimate fact of ownership of the land in controversy, nor is it found as a fact that Hirleman, under whom the defendant claims, was a *bona fide* settler on the land in controversy on January 30, 1865, at which date there was filed in the United States land-office at San Francisco the order of the Secretary of the Interior withdrawing from sale and location lands within twenty-five miles on either side of the general route of the Western Pacific Railroad Company, as shown upon its map of such general route theretofore filed. If he was such settler, then the land in controversy did not pass to the railroad company; otherwise it did. The court, therefore, should have found either that he was or was not a *bona fide* settler, in so many words. A *bona fide* settler, within the meaning of section 4 of the act of Congress of July 2, 1864, is one who has made an actual settlement upon public land, intending in good faith to acquire the title thereto from the United States. The words should be held to apply to any actual settler upon land affected by the act at the date of the order of withdrawal provided for in section 7 of the act, and who had settled thereon and made improvements, with the intention, in good faith, of taking at the proper time the necessary steps to acquire the title of the government in any of the modes allowed by

the laws of the United States, and as thus defined are broad enough to include one who has made a settlement with the intention of procuring its location in part satisfaction of any grant made by the United States to the state, and then purchasing from the state. This reservation of land occupied by *bona fide* settlers is not a grant to such persons; they must show themselves entitled to enter it before they are permitted to acquire the title, but it is a withdrawal of such occupied land from the grant made to the railroad company.

I think, also, that as there was no evidence tending to show that Hirleman was not a citizen of the United States, the court would have been justified in finding, from the facts before it, that he was possessed of the qualifications entitling him to purchase land from the state, and that upon January 30, 1865, he was a *bona fide* settler upon the land in controversy within the meaning of the act of July 2, 1864.

BEATTY, C. J., and SHARPSTEIN, J., concurred.

Rehearing denied.