[Civ. No. 793.    Third Appellate District.—April 3, 1911.]

## TOWN OF RED BLUFF, Respondent, v. E. B. WALBRIDGE, Appellant.

TOWNSITE—APPROVAL OF PLATS BY LEGISLATURE—ENCROACHMENT UPON
STREET—PUBLIC NUISANCE—ACTION FOR REMOVAL.—Where the orig-
inal survey of a townsite made in 1853 showed a street eighty feet
in width on which defendant's lot was bounded, and the plat thereof
was in 1860 approved by the legislature, and all streets and alleys
thereon "declared to be highways," which was confirmed, as to said
street, by another official survey thereof, approved in 1861, it is
held that an action will lie at suit of the town to declare that de-
fendant's fence inclosing over nine feet in width of such street is
a public nuisance and an unlawful encroachment upon said street
and to have the same removed.

ID.—HIGHWAYS ON PUBLIC DOMAIN—POWER OF LEGISLATURE—POLICY
OF GENERAL GOVERNMENT.—The state legislature had power to de-
clare a street in a town situated upon the public domain a public
highway if it took no private property except as against the federal
government; but it is the declared policy of the federal govern-
ment to sanction highways upon the public domain on land not
expressly reserved.

Id.—Townsite on Public Domain—Federal Patent in Trust for Occupants—Title to Highways not Intended.—The grant of a patent by the federal government in 1866 to the county judge, "in trust for the several use and benefit of the occupants" of a townsite on the public domain, was not intended to give to any private individual an equitable or any kind of a title to those parts of the townsite that were then legally constituted public highways, but only a title to be deeded to such *bona fide* occupants of other parts of the town as should be ascertained to be such under appropriate regulations prescribed by the legislature.

Id.—Effect of Settlement on Public Domain—Subjection to Highways.—Mere occupancy of part of the public domain by one who does not connect himself with the government title confers no rights against the government or its grantees, and his rights are subject to a highway created thereon.

Id.—Absence of Occupancy at Time of Ratification of Highway.— It is held that the evidence does not show that the defendant or any one of his predecessors in title were in possession of any part of the street, when the same was ratified by the legislature as a public highway eighty feet in width, and that defendant's grantor did not encroach upon the street until after the legislature had ratified the street as a public highway in 1860 and 1861.

Id.—Burden not Sustained to Show Interest in Public Highway.— Where the patent was in trust for those who were in possession of land on the twentieth day of September, 1866, the burden was upon the occupant to show that some predecessor in interest was an occupant of the disputed land when the highway was created, which he failed to do; and where he took his certificate of title to his lots showing nothing beyond the boundaries of the lots as laid down upon the official plat of the town, he failed to connect himself with his claim to an interest in the highway.

Id.—Effect of Nonuser of Full Width of Street.—The town did not lose its right to the full width of the street by mere nonuser of its full width for a long period of time.

Id.—Acquiescence and Estoppel not Shown.—It is held that the evidence fails to show such acquiescence in the occupation of the street as to estop the town from claiming its full width.

Id.—Unauthorized Action of County Surveyor.—The court properly excluded evidence to show a consent of the county surveyor to the possession of the defendant, where no authority was shown to have been given to him by the board of supervisors to narrow the street, which in point of fact ordered the roadmaster to open the streets and alleys.

Id.—Action not Barred by Adverse Possession.—The land inclosed being part of the public street, title thereto cannot be acquired by adverse use, and the action by the town to remove the obstruction

to the street as a public nuisance cannot be barred by occupation of part thereof for the period of ten years.

ID.—EXCEPTION TO RULE.—The only exception to such rule is where the land has ceased to be a public street and is held by the city merely as a proprietary interest.

APPEAL from a judgment of the Superior Court of Tehama County, and from an order denying a new trial. John F. Ellison, Judge.

The facts are stated in the opinion of the court.

W. P. Johnson, for Appellant.

McCoy & Gans, for Respondent.

CHIPMAN, P. J.—This is an action to have an encroachment upon a certain street in the town of Red Bluff, Tehama county, declared to be a public nuisance and an unlawful obstruction, and to have the same removed. Plaintiff had judgment, from which and from the order denying his motion for a new trial defendant appeals.

It is averred in the complaint that Washington street, running north and south, in said town has a uniform width of eighty feet through its entire length, is now and for many years last past has continuously been one of the regularly and legally established and existing public streets and highways of said town; that defendant is the owner of certain six lots, situated in block 27, as laid down on the official map of said town, on file in the office of the county recorder of said Tehama county, the westerly ends of said lots lying along and being identical with the easterly boundary of said street a distance of one hundred and fifty feet; that defendant has encroached upon said street and the sidewalk thereof, along the westerly ends of said lots, "by a fence and sheds, to the extent of nine feet six and one-half inches, and he has inclosed and does now inclose such and said portions of said street and sidewalk"; that, on February 1, 1909, the board of trustees of said town duly adopted a resolution declaring said encroachment to be a public nuisance, and directed suit to be commenced for its abatement.

Defendant does not deny his inclosure of the said strip of
land, but he claims that his lots are not bounded on the west
by the westerly line thereof as laid down on said official map,
but by "a line parallel to the said west line as shown on said
official map and nine feet and six and one-half inches to the
west thereof"; denies that said strip of land forms part of
said street and hence he has not encroached thereon; avers
that the land described in the complaint is part of a tract
granted by the United States by patent dated September 20,
1866, to Warner Earll, judge of the county court of said
county, "in trust for the several use and benefit of the occu-
pants of the townsite of Red Bluff according to their respec-
tive interests, and to his successors and assigns in trust as
aforesaid"; that the town of Red Bluff was incorporated in
the year 1876, but that said town had existed as an unincor-
porated town and had comprised the said land for many years
prior to its incorporation and for many years prior to the date
of said patent; that said strip of land has been inclosed by
defendant and his predecessors in interest for more than fifty
years last past, and has never at any time been opened,
traveled or used as a street or highway; that on March 6, 1868,
and for many years prior thereto, there was a substantial
frame building in said street as laid down on the official map
of said town and bordering upon said strip of land, about one
hundred and twenty feet long and fifty feet wide; that about
the year 1873 and prior to the incorporation of said town, the
board of supervisors of said county ordered the streets of said
town to be opened and the obstructions removed, whereupon
defendant's predecessor in interest, the then owner of said
strip of land and of said lots and the said building at great
cost to him, moved said building under the direction of the
surveyor of said county to a point by him indicated as the
east line of said street, where said building remained until in
1903, when defendant took down the said building and erected
a fence along the west line thereof for its entire length inclos-
ing said strip of land; that ever since said east line of said
street had been fixed by said county surveyor, as aforesaid,
the said line has been acquiesced in as the east line of said
street until the commencement of this action; that plaintiff
is estopped from claiming that said strip of land was a part

of said street, and that the action is barred by section 318 of the Code of Civil Procedure.

The cause was tried by the court, without a jury, and it made findings as follows: 1. That all the allegations of the complaint are true; 2. That the strip of land in question is of dimensions as averred by both parties; 3. That the cause of action is not barred by section 318, Code of Civil Procedure; 4. That the land described in the complaint was granted to Warner Earll as alleged in the answer; 5. That the said town was incorporated in 1876 as alleged and, prior thereto, for many years, existed as an unincorporated town; 6. That said strip of land has not been inclosed by defendant and his predecessors in interest for more than fifty years last past, nor longer than since the year 1865. "Said described land has been inclosed since the year 1856, but not by said defendant or his predecessors in interest"; 7. That said strip of land has never at any time been opened or traveled or used as a street; 8. That neither on March 6, 1868, nor for any time prior thereto was there a substantial frame building in said street as said street is laid down on the official map of said town; that some time after July 6, 1868, one H. C. Curry erected a barn and shed in said street as so laid down on said map and bordering on said strip of land and of the dimensions alleged; 9. That about 1873 and before said town was incorporated, and while the streets thereof were under the control of the board of supervisors of said county, the said board ordered the streets opened and the obstructions removed; 10. That the predecessor in interest of defendant and the then owner of the said lots and the said building, after said order was given and made, and about 1873, and in consequence thereof, moved said building upon the said lots and upon the strip of land. "That at said time the said predecessor in interest of the defendant was not the owner of said strip of land"; 11. That after said removal of said building and until about 1903, when defendant took down said building, the west line of said building formed the west line of said strip of land for a distance of one hundred and twenty feet, being the entire length of said building, and when so taken down defendant built a fence along the west side of said strip; 12. That said building was not removed at great expense or at any expense greater than $100; 13. That the line to which

said building was removed "has not been acquiesced in as the east line of said Washington street"; 14. That plaintiff is not estopped from claiming that said strip of land is a part of said street. With the pleadings before us and the findings thus given, which latter seem to have support in the evidence, the opinion rendered by the learned trial judge, brought to our attention by respondent, clearly and as succinctly as the questions raised may readily be disposed of, covers the principal points involved in the case. It is as follows:

"The plaintiff has brought this action to have removed a fence which it claims is an encroachment upon a part of Washington street, in the plaintiff town and an obstruction to said street. The case as made up and presented may be stated in narrative form in such manner as to present the controlling features of the situation and make apparent the grounds of the conclusions I have reached.

"In 1853 the land embraced in the present town site of Red Bluff was public land of the United States. Some parts of it were occupied by settlers, but it was simply a small village. In that year one Gillette made a map of the town of Red Bluff, showing streets, alleys, blocks and lots. The blocks were represented as being three hundred feet long by two hundred and fifty feet wide, with an alley extending through them from about north to south, twenty feet wide. The lots were all marked as having a frontage of twenty-five feet and a depth of one hundred and fifteen feet. Upon this map appeared, among others, a street marked Washington street, of a uniform width of eighty feet, extending through the whole length of the town from about north to south. This map showed, among others, a block numbered 27, bounded on the east by Main street, on the north by Hickory street, on the west by Washington street and on the south by Walnut street. The map showed this block to be divided into twenty-four lots, each twenty-five feet wide by 115 feet deep. Lots 1 to 12 (inclusive) face on Main street and lots 13 to 24 (inclusive) face on Washington street. The evidence does not show for whom nor by what authority Gillette made this map. It was filed in Book 'A' of Patents sometime in the year 1859.

"The property in controversy in this action is a strip nine feet six and one-half inches wide by one hundred and fifty feet long, lying along and west of the west end of lots 19 to

24 inclusive in said block 27, the whole thereof being in Washington street as said street appears on the Gillette map. At the time the Gillette map was made in 1853, the west half of block 27 was vacant, unfenced and unimproved land, with a growth of chapparal upon it. In 1856 the west half of the block was inclosed by a fence, which fence extended out into Washington street, as said street was shown on the Gillette map, a distance of about 34 feet. It does not appear who put this fence along that part of the block west of lots 19 to 24.

"On April 30, 1860 [Stats. 1860, p. 343], the legislature of the state of California passed an act as follows: 'That all streets and alleys in the town of Red Bluff, as described on the plat of the said town, are hereby declared to be highways.' The evidence shows that at that time no plat of the town had been made other than the Gillette map, and I conclude that this act referred to that plat.

"On the 20th day of February, 1861, Lucien B. Healey, county surveyor of Tehama county, made and filed a map of the town of Red Bluff, in the county recorder's office of Tehama county. This map refers to the Gillette map and states that blocks numbered 1 to 48 inclusive, except blocks 16, 19, 15, 6 and 7, are shown on this map as they appear on the Gillette map. Upon the Healey map, Washington street is shown as 80 feet wide its whole length, and the lots in block 27 are shown as 25 feet front by 115 feet deep, the same as on the Gillette map.

"On the 23rd day of March, 1861 [Stats. 1861, p. 72], an act of the legislature was passed which provided: 'The plat of the town of Red Bluff, as made by L. B. Healey, Feby. 20th, 1861, is hereby declared to be the official map of said town and all questions arising as to the size or locality of the streets, alleys, blocks and lots, said plat shall be evidence of such size and locality.'

"On the 20th day of September, 1866, a patent was issued by the United States to Warner Earll, county judge of Tehama county, California, conveying to him the town site of Red Bluff (which patent embraced all the lands shown upon both of the maps above referred to), 'in trust for the several use and benefit of the occupants of the said town site.'

"In 1868 [Stats. 1867–68, p. 109], the legislature of the state of California passed an act providing a method for the

giving of titles to the lots in the town to the occupants thereof. Section 15 of said act provided: 'In all proceedings under this act, the blocks and lots when mentioned shall be designated with reference to the official plat of the said town.' Section 16 provided: 'The town plat or map filed in the county recorder's office on the 20th day of Feby. 1861, shall be the official map or plat of said town and all the streets, alleys and public squares as designated upon the said plat or map are hereby dedicated to public use.' Section 17 provided: 'When there have been brick or other substantial buildings erected, not in exact accordance with the said official map, the owner or owners of such buildings shall be entitled to the land upon which said building shall stand.'

"The first deed to the lots 19 to 24 inclusive that appears is one dated March 23, 1861, by which one William Peyton deeds them to William Cook. There is no evidence to show that Cook ever deeded them to any one. The next deed appearing is a deed from Joseph Smith, sheriff, to one Hollister, dated Feby. 3, 1865, conveying to him all the interest of W. T. Brooks, J. N. Williams and Alpheus Bull in and to the lots. It does not appear how or when or from whom these three acquired an interest in the property. Hollister conveyed to Curry and Nicholson, March 11, 1868. July 1, 1868, Curry obtained from the county judge a certificate of title to the lots and his title by mesne conveyances came regularly down until it vested in the defendant. No one has ever acquired any record title to the strip in dispute, either from the general government or from the county judge. The evidence shows that the strip in dispute was inclosed along with the adjoining lots in 1856 and has been inclosed ever since and during all that time has been used as a corral. Some time after March 11, 1868, H. C. Curry, the then occupant of the lots 19 to 24 inclusive, built a feed shed about 25 feet wide along the whole length of the west end of the lots, except about 30 feet at the south end thereof. This shed was out in Washington street about 25 feet west of the present fence of the defendant. Some time between 1870 and 1875 this shed was moved in, so that its west line was on a line with where the defendant's fence now stands and remained there until after 1899, when it, being old and rotten, was torn down and a fence

—the present fence built along where the west line of the shed had stood.

"From the foregoing I think the situation may be fairly stated as follows: In 1860, when the legislature passed the act declaring all streets shown on the plat of the town of Red Bluff then on file to be public highways, all the lands in Red Bluff were public lands of the United States and subject to disposal by it to any person, in any manner and on any terms it saw fit to impose. It is true there were parts of the town site in the possession of individuals, but they had no title or interest in the land other than such as their mere possession gave them. But none of them, so far as the evidence shows, had taken any steps to acquire title from the United States government under any of its laws providing for the disposal of government lands. At that time there were two maps on file showing Washington street to be a street 80 feet wide, one the Gillette map, made in 1853, and one the Healey map, made in 1861. The act of 1860 declared all streets on the Gillette map to be public highways and the act of 1861 declared all streets shown on the Healey map to be public highways.

"In 1866 the land embraced in the town site of Red Bluff was deeded to the county judge 'in trust for the several use and benefit of the occupants thereof.' It must be apparent to anyone, I think, that the federal government, in deeding the town site to the county judge, did not intend to give to any private individual an equitable or any kind of a title to those parts of the town site that were then legally constituted public highways. It intended that all public highways thereon at the time of the patent should remain public highways until abandoned by some competent authority and that the other parts of the town site should, under appropriate regulations to be prescribed by the legislature, be deeded to those who were *bona fide* occupants at the date of the patent. So this necessarily brings us to a consideration of the question: Was Washington street, at the date of the patent, a public highway, 80 feet wide where it passes along west of block 27?

"I think it beyond question that the legislature had power, by the acts of 1860 and 1861 to create Washington street a public highway, if in so doing it did not take any private property. As against the federal government it could not

perhaps make a public highway over its lands without its consent or acquiescence, but the federal government is not complaining and its policy has always been to encourage the building of highways over the public domain, thereby facilitating its settlement and use, and this policy was crystallized into a statute passed on the 26th day of July, 1866, which was as follows: 'The right of way for the construction of highways over the public lands, not reserved for public use is hereby granted.' Was the strip of land in question public land of the United States when the acts of 1860 and 1861 were passed? Did any individual have such an interest therein that the state could not put a public highway over it without the consent of the occupant or by bringing condemnation proceedings? The evidence shows that at the date of those acts the strip was inclosed by a fence, by whom built does not appear. There is no evidence to show that the occupant, whoever he was, had taken any steps to acquire title from the general government.

"In *Wells* v. *Pennington*, 39 Am. St. Rep. 764, [2 S. D. 1, 48 N. W. 305], it is said: 'Settlement on the public lands of the United States confers no rights against the government or its grantees. The settler acquires no vested interest in the land until he has entered the same at the proper land office and obtained a certificate of entry. Until then the land continues subject to the absolute disposing power of the congress.' In the case of *Campbell* v. *Wade*, 132 U. S. 35, [10 Sup. Ct. Rep. 9, 33 L. Ed. 240], Justice Field says: 'It has always been held that occupation and improvements of the tracts desired, with a view to pre-emption, though absolutely essential for that purpose, do not confer upon the settler any right in the land occupied as against the United States which could impair in any respect the power of congress to withdraw the land from sale for the uses of the government or to dispose of the same to other parties.' In *Smith* v. *Mitchell*, 75 Am. St. Rep. 858, [21 Wash. 536, 58 Pac. 667], it is said: 'The act of congress already referred to does not make any distinction as to the methods recognized by law for the establishment of highways.' And in that case it was held that where travel had begun over a piece of land while it was held as a pre-emption claim, such travel created a highway, and when the

patent issued to the patentee he took the land subject to the highway on it.

"In *Labish* v. *Hardy,* 77 Cal. 329, [19 Pac. 531], it appeared that a man and his wife went into possession of a piece of land that was or became a part of the town site of the city of Santa Cruz. The wife died before the act was passed providing for the disposition of the lots and the husband continued to live thereon and procured title. The question arose as to what rights the heirs of his wife had in the lots by reason of her occupancy, the law as to the general rights of the wife in the property of herself and husband being then somewhat different from what it is now. In deciding that the wife by her occupancy acquired no rights in the property that descended to her heirs, the court said: 'We are unaware of any law under which a bare occupancy of any public lands of the United States vests in the occupant any rights or equities in the land occupied. We think no property was acquired in the premises in controversy by either parent of the appellants prior to the passage of the act of congress of July 22, 1866' [14 Stats. at Large, 209] (being the act providing for the disposition of the lots in the town). See *McLaughlin* v. *Monette,* 89 Cal. 363, [26 Pac. 880], for an instructive discussion of the term 'lawful claim to government land' and of the words '*bona fide* settler.' 'We think that they (the words "*bona fide* settler") must refer to one who has done something more than merely occupy land and put a few improvements on it. It cannot be said that every one who enters upon land and builds a fence and cabin or a house is a *bona fide* settler.'

"From the foregoing decisions, and in view of the general policy of the federal government to encourage the establishment of highways upon the public lands, I conclude that the party in possession of this strip of land in 1860 and 1861 did not have such an estate or interest in the land as precluded the legislature, by an act passed, from establishing a highway over it and that a highway 80 feet wide was legally established in 1860 and 1861 by the acts of the legislature, and that Washington street being a legally established highway at the date of the patent, the patent conveyed the land subject to the right of way for a highway thereon. The grant from the United States to Warner Earll of the town site in trust was a grant to him of the lots in trust for the occupants thereof

and of the lands covered by the legally established highways to the use of the public. The patent was dated the 20th day of September, 1866. The act of congress granting rights of way for highways over the public lands of the United States was passed July 26, 1866. The above act reserved to the public the use of all highways that were then across or over the land granted. 'We are of the opinion, therefore, that all persons acquiring any portions of the public lands, after the passage of the act in question, took the same subject to the right of way conferred by it for the proposed road.' (*St. Joe* v. *Baldwin,* 103 U. S. 426, [26 L. Ed. 578], cited in *Okanogan Co.* v. *Cheetham,* 70 L. R. A. 1030, [37 Wash. 682, 80 Pac. 262]. See *Doran* v. *C. B. Co.,* 24 Cal. 256.) The lands embraced in the patent had been platted into streets, blocks and alleys as early as 1853, and the plat filed in 1859. Another plat had been f'ed in 1861, which so far as the property in question is concerned, was a copy of the plat of 1853. Both of these plats were declared official by acts of the legislature and the streets shown thereon declared to be public highways. The patent to the county judge vested an equitable interest in the lots in those who were in possession thereof on the 20th day of September, 1866 (*Eversden* v. *Mayhew,* 65 Cal. 163, [3 Pac. 641]), and those who were in possession before that time and for any reason had ceased to be occupants on that day, had no interest in the lots, legal or equitable. (*Labish* v. *Hardy,* 77 Cal. 329, [19 Pac. 531].) Prior to the date of the patent, the government of the United States had full authority to ignore all claims of those who were or had been in possession, and to convey the land to anyone it chose and upon any terms it wanted to. So I think it must be held that whatever rights or equities the occupants ever obtained in and to any part of the town site they obtained by virtue of the patent and not by reason of anything that had transpired before that time. But for the patent recognizing their possession and granting them certain rights by reason thereof, their occupancy would have been of no avail and would not have conferred any interest in the property occupied. The patent was in trust for the several use and benefit of the occupants of the town site. The use and benefit of the occupants of the town site necessarily required streets and alleys to be maintained so that travel could be had from one part

to another. 'The grant of the lots by congress to the occu·
pants according to their respective rights necessarily recog-
nized the existence of streets and alleys as then laid out and
used and such grant was a dedication of them to the public.'
'Disposing of the land covered by the town site to the occu-
pants according to their several rights and interests could
not be done except that the streets and alleys thereon for
public use were reserved to the public.' (*Parcehr* v. *Ashley,*
[5 Mont. 68], 1 Pac. 204.) From this I conclude that, the
land being the property of the government at the time of the
patent and no person having any such rights in any part of it
as would preclude the government from disposing of it as
it saw fit, it had a clear right to sell it in view of the situation
as to the streets and alleys and of the highways established
by the acts of the legislature of the state, and that the patent
was intended to vest in the public the use of the highways
then existing.

"It must be borne in mind that the legislature in passing
an act to dispose of the lots to the occupants, re-declared the
streets and alleys, as they appeared on existing maps, to be
public highways. It did not attempt to make a new map or
to change any of the streets as to location or size, but adopted
a condition that had existed ever since 1853. This observa-
tion is in answer to many of the cases cited where the legis-
lature, after the execution of the patent in trust, undertook,
by making a new map and survey, to change and affect the
rights of occupants as they were at the date of the patent.

"There is another view of the case that may be taken.
The plats of the town, showing streets and blocks, were filed
in 1859 and 1861. In 1860 and 1861 the legislature passed
acts declaring those streets of the width shown on the maps
to be public highways. The evidence does not show that the
defendant or any one of his predecessors in title were in pos-
session of the strip in dispute at that time. The defendant's
chain of title only runs back to a deed from the sheriff of
the county to one Hollister in 1865. One William Cook ob-
tained a deed from William Peyton, March 23, 1861, but
there is nothing to connect Cook with the defendant. So it
must be held that the defendant's grantors went into posses-
sion of the strip of land after the plats of the town had
been filed and after the legislature had declared the street

to be a public highway, 80 feet wide. In *Alemany* v. *City of Petaluma,* 38 Cal. 559, it is said: 'If the land in contest was a part of one of the streets of Petaluma as laid down on the plan of the town when the occupation of the plaintiff's grantors began, his occupation was not *bona fide* within the meaning of the act of congress of March 1, 1867, [14 Stats., p. 418], and the plaintiff cannot recover.' In *Jones* v. *City of Petaluma,* 36 Cal. 237, it is said: 'The effect of the act of July 1, 1864 (so-called "Town Site Act," 13 Stats. (1864), p. 343), was to withdraw land upon which cities and towns had been established before the passage of the act or might be established thereafter from the operation of the general statutes relating to the disposal of the public lands and to provide a different system in some respects for their disposal. The former system was inapplicable to such cases and would have worked much mischief. Accordingly some plan was needed by which towns and cities already established could be secured in the privileges which the former had usurped and the latter needed. The act of July 1st was the result. Its result was to confirm the usurpations of the past and to provide a lawful mode for the acquisition of such privileges in the future. Its effect was to ratify and confirm the use to which the land had been put by cities and towns for the purpose of streets and squares and alleys and to permit such use in the future by providing for the sale of *lots* only. It was a dedication to the public of so much of the public land as had theretofore been appropriated to streets and squares and alleys, and a license for a like appropriation in the future. Such being the object and effect of the statute, if the land in question was public land (and by public land we mean land to which no private rights had attached at the time the steps in question were taken) we are unable to see why the city of Petaluma did not acquire a right to it as a public square. If so the plaintiff could not thereafter, while it so remained, acquire a *bona fide* occupation, within the meaning of the act of 1867 which obviously refers only to lands in lots and not to lands in streets and alleys.' While the act above considered was not the act under which the town site of Red Bluff was secured, its general subject and purpose were the same and the decision seems to me to be very much in point.

"From all this I conclude that Washington street is a legally constituted public highway, 80 feet wide, and that the defendant has shown no legal justification for putting or maintaining any obstruction in any part of it and that the city has the legal right to have the obstructions removed so that the public may have the free use of all of it for travel and other municipal purposes. Findings and decree will be drawn in accordance herewith."

Appellant contends that, as title to the townsite starts with the government, the burden was on plaintiff to connect itself with that title, which it has not done except by dedication, and this could not be accomplished as against the government by the legislature. We think the learned trial judge showed, by the legislative history relating to the land, by the filing of plats of the town, as early as in 1859 and 1861, designating the streets, alleys and lots, as they have ever since existed, and by the Earll patent, which issued subsequently to the act of Congress expressly granting right of way over public lands not reserved for public use (U. S. Stats., July 26, 1866, [14 Stats., p. 251]), sufficient, at least, to make a *prima facie* case, and to cast the burden upon defendant to bring himself, through some predecessor in interest, within the trust clause of the patent and to show that such predecessor was an "occupant" of the disputed land, such as was contemplated by the patent. This defendant failed to do. He does not, as the court found, connect himself with any title prior to the issuing of the patent. A sheriff's deed was introduced to show a conveyance to one Hollister in 1865 and by Hollister to H. C. Curry, from whom defendant deraigns title. But the sheriff's deed to Hollister and his to Curry refer to the lots and block as designated on the official plat, and lend no support to the claim of occupancy of the strip in controversy. Plaintiff was not called upon to show occupancy of the street for highway purposes in order to show title. Its title is deraigned from the government, and it could not be questioned except by someone bringing himself within the saving provisions of the Earll patent. There is no evidence connecting Hollister's title with the government or to show that he conveyed this strip of land or intended to convey it, and it does not appear very clearly who first erected the obstruction in Washington street. Hollister conveyed to

Curry May 11, 1868, and Curry's title is connected with the Earll patent by certificate of the successor to Earll and is dated July 6, 1868. It recites the provisions of the patent, also that it is issued in conformity with the acts of Congress and of the legislature, and grants "the following property described according to the official plat of said town as lots," etc., naming the said lots. It appears that at this time the obstruction now complained of existed and Curry was using the shed and building on the said strip, but if he claimed it as an occupant by virtue of the provisions of the patent, it was his duty to have made known his claim to the county judge when he applied for the lots and to have had his certificate issue in conformity with his claim and proofs. In our opinion, he took nothing by his certificate of title beyond the boundaries of the lots as laid down on the official plat of the town.

The evidence was that the street was used in its entire length but was never opened and used for its full width, and defendant claims that by nonuser plaintiff lost its right to any greater use than had been given the street. The plaintiff having acquired a right to an eighty-foot street, such right was not lost because only part of this width was in fact used. Even where the right is by dedication, "the sale of lots," says Mr. Elliott, "with reference to the plat fixes the private rights of purchasers." (Elliott on Roads, 2d ed., sec. 118.) It often happens that in towns and cities there may be streets only partially improved and used, or used not at all, for a long period, but the public does not necessarily thereby lose its right to such streets. (*Meier* v. *Portland etc. Co.*, 16 Or. 500, [19 Pac. 610, 1 L. R. A. 856] ; *Beall* v. *Weir*, 11 Cal. App. 364, [105 Pac. 133].)

The evidence does not support defendant's contention that the public and plaintiff acquiesced in the occupation of the street by defendant and are estopped now to claim the full width for the street. Even defendant was ignorant of the fact that his inclosure extended into the street. He testified: "I had no idea when I bought the property that there was inclosed there between the alley and the east line of Washington street more than the regular one hundred and fifteen feet."

The court refused to allow defendant to prove that similar conditions existed at some other points on this street. We cannot see that the inquiry was material.

Defendant offered witnesses to show that the county surveyor, pursuant to the order of the supervisors to remove all obstructions from the streets, indicated the line to which the obstructions were to be removed, and that this line was the same as the west line of the strip now in controversy. In ruling, the court said: ''I still adhere to my original proposition, Mr. Johnson, that if you can prove that that property, at the date of the patent, was in the occupancy of somebody you will have a right to do it. If it is a matter of fact that there was a street there eighty feet wide, Mr. Shackelford (the county surveyor) had no authority to cut it down to sixty by anything he might do.'' In this view of the matter we concur. In point of fact, the order of the board of supervisors was that the roadmaster open the streets and alleys. No authority is shown to have been given to Shackelford.

Other assignments of error do not seem to present any point not disposed of.

The claim that the action is barred by section 318, Code of Civil Procedure, is based on the assumption that ''the land inclosed by the defendant never was a street, and that defendant has been in possession of said strip of land for about ten years immediately preceding the commencement of the action, claiming to.be the owner adversely to the whole world.'' The first premise is not supported by the evidence. The land inclosed was part of a street. Upon the other ground, suffice it to say that title to a public street cannot be acquired by adverse use. (See subject fully considered in *People* v. *Kerber,* 152 Cal. 731, [93 Pac. 878].) This is the rule, in general, and ceases to operate only where the public use is abandoned by competent authority and the land is held as proprietary property. (*Id.*)

The judgment and order are affirmed.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 2, 1911.