[No. 1596.]

## WILLIAM B. STANLEY, APPELLANT, v. THE MINERAL UNION LIMITED, A CORPORATION, AND H. HIRSCHING, ET AL., RESPONDENTS.

MINES—STATE LANDS—RIGHTS OF PATENTEE. The act of Congress of June 16, 1880 (21 Stat. 287), granting certain lands to the State of Nevada, authorized the state to dispose of them under such regulations as the legislature should prescribe. The act of March 5, 1887 (Comp. Laws, 325, 327), after providing for the sale of such lands, provided that nothing in the act should be construed to prevent any person entering on the lands to prospect for minerals, or to prevent the economical working of any mine which might be discovered therein (Stats. 1887, 102; Comp. Laws, 281-282), *provided*, that any citizen might enter on any mineral lands in the state, notwithstanding the state's selection of it under grants, and explore for minerals, and, on the discovery thereof, mine the same, except that improvements made by persons purchasing the land from the state should not be taken or injured without compensation, and that thereafter all patents made by the state should reserve all mines that might exist on the land: *Held*, that one taking a patent to such lands, with such reservation, acquired no interest in a mine located after his application was filed, and before the patent issued, notwithstanding that the selection by the state under the grant from the government determined that the lands were agricultural and non-mineral, within the meaning of the grant.

PRACTICE ON APPEAL—INSTRUCTIONS. Where the instructions are not in the statement, and where no objection was made or exception taken to the action of the court, alleged error, based upon the giving and refusal to give certain instructions, is not properly before the court for consideration.

Appeal from the Fourth Judicial District Court, Lincoln County; *G. F. Talbot*, Judge.

Action by William B. Stanley against the Mineral Union Limited, a Corporation, and H. Hirsching and others. From a judgment for defendants, plaintiff appeals. **Affirmed.**

The facts sufficiently appear in the opinion.

*Henry Rives*, for Appellant:

I. For the purposes of the argument in this case, but without an admission of the truth of the testimony, it may be said that the defendants established on the trial that in January, 1889, they discovered, located and have since occupied and developed a mineral ledge, lode, vein or deposit within the confines claimed by them, as constituting the "Hirsching Lode-Mining Claim," and it may also be said that neither the government of the United States, nor of the

State of Nevada, should have issued a patent to *valuable* mineral land to the appellant under the *circumstances of this case.* Still it is patent that they have done so, and that under proper conditions the authority existed in both the general government, through its officers, and the State of Nevada, likewise, through its officers, to issue a patent to this land. It must be held, and it is evident that in order to issue such a patent as is in controversy in this cause, the land officers of the general government in the first place, and those of the State of Nevada in the second place, are invested with *discretion* and *authority* to determine whether the land listed or patented to the State of Nevada, and by it to its grantees, contained any "valuable minerals"; and it is also evident that up to the date of such patent, this *discretion* and *authority* is invested solely in these respective officers, and from the fact of the issuance of this patent, it is also evident, and must be conclusively determined, that they have judiciously, carefully, prudently and finally (at least to the date of patent) exercised their *discretion* and *authority* in this respect in favor of the appellant; hence the appellant contends that his patent amounts to an adjudication in his behalf by each and every possible authority which could exercise any determination in the matter, to the date of his patent, in his favor, that *all* of the land described in the patent is subject to such a patent, and that they had *authority* to issue it, and that they had *adjudged* it to be of that character of land for which they had authority to issue such a patent.

II. Since the erroneous contentions of counsel for the defendants and the ruling of the court in this case, I may be permitted to indulge in and reiterate the surprise, which is expressed by the Supreme Court of the United States, in a similar case (*Steel* v. *Refining Company*, 106 U. S. 447) wherein that court used the following language: "We have so often had occasion to speak of the *Land Department*, the object of its creation, and the powers it possesses in the alienation, by patent of portions of the public lands, that it creates an *unpleasant surprise* to find that counsel in discussing the effect to be given to an action of that department, overlook our decisions on that subject."

III.  The appellant contends that the land officers of the general government, through whom this land was listed or patented to the State of Nevada, had the authority to determine every preliminary fact necessary and incident to the issuing of said "list," or patent to the State of Nevada; he further contends that similar authority existed in the land officers of the State of Nevada, before they issued the patent, in evidence in this case, to him.  In this connection he also contends that this exercising of authority by these two respective sets of officers involved the duty on their part to determine whether the land embraced in this patent to plaintiff was of such "*character*" as, under the statute and grant to the State of Nevada, they had the right or *authority* to list and patent in the first place, and in the second place to finally patent to plaintiff.  He also contends that this authority having been vested in them, and they having exercised it, the exercise of that authority cannot be called in question, except in a direct action to correct their judgment in respect to the matter in which they have acted.

IV.  The appellant might safely rest this cause by citing a few decisions from the Supreme Court of the United States on the foregoing points, but in order to establish to the court, that the rule laid down in a number of the decisions of the Supreme Court of the United States, with few (less than one-half dozen) exceptions, the state courts have invariably followed these decisions; and these exceptions (which occur in California in similar cases) have later been expressly overruled, and the only decision which I have been able to find which in the slightest upholds the contention of the defendants is an early case in the 5th Oregon.  (*Gold Hill Quartz Co.* v. *Ish*, 5 Or. 104, or 11 Morrison's Mining Reports, 635.)

V.  The appellant cites the court to the case of *French* v. *Fyan*, 93 U. S. 169, because that case in particular appears to be exactly like the one at bar.  In that case a patent had been issued to the State of Missouri for certain swamp and overflowed·land, under a certain act of Congress; a party claiming the land under a grant to a railroad company which would have carried the title, if the land were *not* swamped, brought an action of "ejectment," and sought to introduce parol evidence to prove that as a matter of fact the land was

not of that *character*, and to thus impeach the validity of the patent.    There, as in the case at bar, the question was as to the *character* of the land.    The court below rejected the offered evidence, and held that the patent concluded the question.    The Supreme Court of the United States, in *French* v. *Fyan, supra*, sustained the ruling of the court below, and in delivering its opinion said:    "We are of the opinion that in this action of law it would be a departure from sound principle and contrary to the well-established judgments in this court, and in others of high authority, to permit the validity of the patent to the *state* to be subject to the test of the verdict of a jury on such oral testimony as might be brought before it; it would be substituting the jury, or the court sitting as a jury, for the tribunal which Congress had provided to determine the question, and would be making a patent of the United States a cheap and unstable reliance as a title for lands which it purported to convey."

VI.    In the case of *Steel* v. *Smelting Co.*, 106 U. S. 447, 1 Sup. Ct. Rep. 389, the court says:    "We have often had occasion to speak of the land department, the object of its creation, and the powers it possesses in the alienation by patent of portions of the public lands.    \* \* \*    That department, as we have repeatedly stated, was established to supervise various proceedings, whereby a conveyance of the title of the United States to portions of the public domain is obtained, and to see that the requirements of different acts of Congress are fully complied with.    Necessarily, therefore, it must consider and pass upon the qualifications of the applicant, the acts he has performed to secure the title, the *nature* of the land, and whether it is of the *class* which is open to sale.    Its judgment upon these matters is that of a special tribunal, and is unassailable except by direct proceedings for its correction or annulment.    Such has been the usual language of this court in repeated decisions."

VII.    The pith of the whole matter is aptly expressed by the same court in *Smelting Co.* v. *Kemp*, 104 U. S. 641–646, where, speaking of the land department, it says:    "Indeed the doctrine as to the regularity and validity of its acts, where it has jurisdiction, go so far that if *in any* circumstances, under existing law, a patent would be held valid, it

will be presumed that such circumstances existed." Further, that court, in the case last cited used the following language: "When the authority depends upon the existence of true facts, or upon the performance of certain antecedent acts, and it is the duty of the land department to ascertain whether the facts exist, or the acts have been performed, its determination is as conclusive of the existence of the authority against any collateral attack, as is its determination upon any other matter properly submitted to its decision." (*Beard* v. *Federy*, 3 Wall. 478–492; *Polks, Lessee,* v. *Wandell,* 9 Cranch; *Patterson* v. *Winn,* 11 Wheat.; 11 Morrison Mg. R. 682; *Hoofnagle* v. *Anderson,* 7 Wheat. 212; *Boardman* v. *Lessees of Reed,* 6 Pet. 328; *Bognell* v. *Broderick,* 13 Id. 436; *Johnson* v. *Towsley,* 13 Wall. 72; *Moore* v. *Robbins,* 96 U. S. 550.)

VIII. The Supreme Court of California, more than any other state, has had occasion to pass upon the question as to the *conclusive character* of patents, both state and federal, and all of her earlier decisions seem to correspond with the doctrine invariably laid down by the Supreme Court of the United States, except in three instances, viz: *McLaughlin* v. *Powell,* 50 Cal. 64; *Carr* v. *Quigley,* 57 Cal. 394; *Chicago Q. M. Co.* v. *Oliver,* 16 Pac. 780. And in *Gale* v. *Best et al.,* 20 Pac. 552–3, that court expressly overrules each of these three vicarious rulings, and again reverts to its former position and rulings, and therein quotes and approves the rulings of the United States Supreme Court on this subject and to which it has since adhered.

IX. The later cases in California strictly follow the Supreme Court of the United States as set forth in *French* v. *Fyan,* 93 U. S. 169; *Refining Co.* v. *Kemp,* 104 U. S. 636; *Steel* v. *Refining Co.,* 106 U. S. 447; *Sparks* v. *Pierce,* 115 U. S. 408; *Wright* v. *Roseberry,* 121 U. S. 488; *Borden* v. *R. R. Co.,* 154 U. S. 288, all of which declare that a patent cannot be invalidated, or called in question in any collateral manner, but it may be done, only, in a *direct action*— undoubtedly by the general government—for that purpose; and all of these cases also declare that the "*character*" of the land or any other reason why the patent ought not to have been issued cannot be set up in defense, or these matters

inquired into by a court or jury, in an action founded upon a patent, which is *prima facie* good on its face. (*Gale* v. *Best*, 78 Cal. 235; 20 Pac. 558; *Irvine* v. *Tarbot*, 105 Cal. 237; 38 Pac. 896.)

X.   It may be claimed that *some* of the above cited cases appear to hold that the above doctrine obtains only in cases where "the patent contains no reservation," and that, as the patent in this does contain a reservation, therefore the converse of the proposition holds.   In reply to this claim, in case it should be made, I venture that the reference in any of these decisions to a reservation in the patent is mere *obiter dictum*, for I am unable to find that any such point was made or any such distinction urged in either of them, while in several cases, where *reservations* have existed in patents, and this distinction urged as cause to open the door to testimony and collateral attack, the courts have swept it aside, and have held that no law ever existed which authorized any land office official to insert any reservation, and that therefore such reservations, when found in patents, have only found a place therein *ex industria* some official.   (*Cowell* v. *Lammers*, 10 Saw. 246, 21 Fed. 200; *McGarroghan* v. *New Indria Co.*, 5 Morrison M. 641; *Foscalina* v. *Doyle*, 47 Cal. 437; *Gale* v. *Best et al.*, 20 Pac. 552.)

XI.   Certainly it must be admitted that because the surveyor-general of Nevada *recited* in the patent in this case "that all mines of valuable minerals are excepted," it does not make that part of the *law* any more or less binding on the patentee, for he accepts the patent subject to the conditions imposed in the grant to this state, and is as much admonished by the language of the *law*, granting the land to Nevada, as he could be, by any industrious *recital*, or so-called *reservation*, inserted by an over-cautious executive officer, whose zeal may have led him to make the reservation, and the most that can be claimed for such a clause in a patent is that it is simply a reiteration of the statute.   Besides, when one such officer issues such a patent, it is a declaration on his part that, notwithstanding the granting act reserves all valuable minerals, still he has found none to be contained in the land; that the land is of a "*character*" which should be patented in such a case; that he had the *authority* to issue it,

and that the patentee had complied with all the forms of law requisite to entitle him to the patent.

XII.   The statute quoted in the two instructions given at the request of defendants expressly disclaims all interest in lands which are mineral in character, and which have been, or which may hereafter be, granted by the government to the state.   It likewise also disclaims any such interest for its grantees, and expressly declares that all title to lands containing minerals must be obtained from the general government.   So far as this disclaimer is concerned, it is simply supererogation, for the grants themselves reserve the valuable ' minerals and the rights of the government concerning them is neither increased or diminished by the statutory enactment.   So far as the declaration in the statute, to the effect that all title to mineral lands shall be obtained from the general government, is concerned, it must be admitted that this is equally idle and useless, no title to any mineral ever having been obtained west of the Mississippi, except from the government direct.   The statutes of Nevada also provide that in all contracts and patents issued by it, all minerals shall be expressly reserved, and each of these declarations are as inoperative as possible for any useful purpose, and come under the same rules as laid down by the supreme courts of the United States, California, Montana, Colorado, and Utah, which all declare them of no force or effect, have held that patents issued for such land as is in controversy in this case, can only be questioned by the United States, and then only in a direct action for that purpose.   Hence, the legislature has given us no new law, for its declaration, disclaimers, and reservations were decided to exist and be the law before our sapient statesmen went to such unnecessary display.

*F. R. McNamee*, for Respondents:

I.   The plaintiff contends that the defendants in their answer seek to attack a patent collaterally, while in truth and in fact they simply claim possession to the ground under a lawful location of mineral lands, which said mineral was never by any grant, either from the general government or from the State of Nevada, conveyed to the plaintiff, but was in the granting clause of the patent, issued to Stanley by

Nevada, expressly reserved to the state. (Stats. 1887, 102–103; Stats. 1897, 36.) Mining being the paramount interest in this state, this special-industry is protected to the extent of special reservations in all patents issued by the state purporting to convey agricultural lands.

II.   The decisions cited by plaintiff sustaining his contention that a patent cannot be attacked collaterally cite good law, but are wholly foreign to the issue of the case at bar, for in this case no minerals or mines are granted by the patent, but are reserved expressly for the miner to enter ·upon, prospect and mine the precious metals.

By the Court, MASSEY, J.:

This is a proceeding in ejectment and for damages. The verdict of the jury was for the respondents. From the judgment rendered thereon, and the order denying the motion for a new trial, this appeal was taken.

Briefly, that part of the answer of the respondents pertinent to the question presented on the appeal sets up as a defense that the respondents were in possession of the premises in controversy under and by virtue of a valid mining location made on the 14th day of January, 1899, by the respondent, Henry Hirsching, known as the "Hirsching Lode-Mining Claim," record of which had been duly made upon the records of the Yellow Pine mining district, and upon the records of the recorder's office of Lincoln county, wherein said mining claim and mining district are situated; that said claim contains large deposits of gold, silver, and copper ore, and is valuable only for the precious metals therein contained; that after making the location the respondents had done a large amount of development work thereon, and had erected thereon certain buildings and a plant for the reduction of ores, at a cost of about $40,000.

The appellant showed title to the lands from the state by purchase under patents issued on the 23d day of May, 1899.

It was further shown, and is not disputed, that in the year 1893 the appellant made application to purchase the lands in controversy from the State of Nevada, as agricultural lands, under the grant made by the act of Congress of June 16, 1880 (21 Stat. 287), of 2,000,000 acres, in lieu of the sixteenth

and thirty-sixth sections, before that time granted for the support of the common schools.

It is also conceded that all necessary and proper steps were taken for the selection of the lands by the state, and its approval by the proper officers of the government.

It was also shown that on the 7th day of February, 1896, and after the act of selection had been made, the state entered into a contract for the sale of the lands to the appellant, and thereafter patents were issued to the appellant under said contract of purchase. The evidence offered by the respondents supports the defense made by that part of the answer above set out, and the jury by its verdict so found.

Appellant contends that these averments of the answer, and the facts shown thereunder, conceded to be true for the purpose of the argument, are no defense as against his rights under the patents from the state, and are not sufficient to authorize either the verdict of the jury or the judgment of the court.

It is ably argued in support of this contention that the selection of the lands by the state under the grant, and the approval of such selection by the proper officers of the government, were a conclusive determination by the tribunal having authority for that purpose that the lands were agricultural and non-mineral, within the meaning of the act making the grant; that the act of selection by the state, and its patents to him, gave him the right to the exclusive possession of the lands embraced therein from the time he made his application, or at least from the date of the contract of purchase; that the subsequent discovery of valuable mineral lodes by the respondents gave them no rights as against the selection by the state, and his rights under the state's patents; that any attempt to defeat his rights in this proceeding under the patents is a collateral attack upon the findings of the authorized tribunal that the lands were agricultural and non-mineral in character, and excepted by the act from the grant; that an attack involving the character of the lands could only be made in a direct proceeding instituted for that purpose, and that the entry of the respondents upon the lands after selection by the state, and after appellant's contract of purchase had been executed, was a trespass, and such entry, even

though the mining rules, laws, and regulations had been strictly complied with, did not initiate any right in the respondents as against the appellant.

A large number of the authorities are cited by the appellant to support this contention, and, in a proper case, would control; but as the cases cited do not, as we believe, apply to the case at bar, we do not deem it necessary to discuss or review them.

The question must be determined, as we view it, by the application of certain statutory rules, the enactment of our legislature. While it is probably true that under the act of June 16, 1880, *supra*, making the grant, and excepting therefrom mineral lands, the selection by the state, and the approval of such selection by the authorized officers of the government, is such a determination of the agricultural and non-mineral character of the land, within the meaning of the grant, as to preclude any investigation involving that question in proceedings of this character, based upon the subsequent discovery of valuable mineral deposits, it does not necessarily follow that the state must, under its laws regulating the sale of the lands thus acquired, by its conveyance vest in its grantee the same title and right acquired from the government under the grant.

By Section 3 of the act of June 16, 1880, *supra*, the state is, in direct terms, authorized to dispose of the lands under such laws, rules, and regulations as may be prescribed by the legislature. The only restriction or limitation found in the act relates to the use of the funds arising from the sale of the lands granted.

The language used is clear and explicit. The laws, rules and regulations for the disposal of the lands should be such as were prescribed by the legislature of the State of Nevada. In this matter power was delegated by Congress to the legislature. The disposal of the land was left to its judgment and wisdom, and long before any steps were taken by the appellant to acquire or even initiate any right to the lands in controversy the legislature of this state, by law, defined his rights, as an applicant and contractor, to purchase the lands under the grant, and made provision for the maintenance of actions to sustain and protect the same.

By the act of March 5, 1887, the legislature, in the exercise of this delegated authority, prescribed by law to the effect that every person who has applied or may thereafter apply to or contract with the state to purchase land under the grant, in good faith, and who has paid or may thereafter pay to the proper officers of the state the required amount of money under such application or contract, shall be deemed and held to have the right to the exclusive possession of such land, provided that no actual adverse possession thereof existed in another at the date of the application.

It was further provided that every person who has contracted with the state in good faith to purchase such land shall be entitled to maintain or defend any action at law or in equity concerning the same or its possession which may now be maintained or defended by persons who own land in fee, and that every person who has applied or shall thereafter apply to purchase, in good faith, such land, and has paid or shall thereafter pay the required amount of money under the application to the proper officer, shall be deemed and held to have the right to the exclusive possession of such land, and shall be entitled to maintain and defend any action at law or in equity concerning the same or its possession which may be maintained or defended by persons who own land in fee, provided no actual adverse possession of such land existed in another at the date of the application. If the legislature had gone no further, then, under this statute, should the contention of the appellant be sustained, but it did not stop with these provisions.

By Section 3 of the act it provided in direct terms that nothing in the act contained should be so construed as to prevent any person or persons from entering upon such lands for the purpose of prospecting for any of the precious metals, or to prevent the free and economical working of any mine which may be discovered therein. (Comp. Laws 1900, 325-327.)

At the time the respondent Hirsching entered the lands in controversy and made the mining location, the appellant claimed them under his application and contract to purchase; and, by the provisions of Section 3 of the act, Hirsching had a right to enter for that purpose. He was not trespassing at

the time he entered, and by making his mining location he initiated the right by which he was enabled to work in a free and economical manner the mine which he discovered. The strength and infirmity of this act entered into and became a part of appellant's contract. He took possession of his land with his rights of action and right to exclusive possession limited by the provisions of said Section 3. By its terms he could neither hold possession as against respondents, nor could he maintain an action to recover possession as against them, under the showing of the record.

It cannot be successfully claimed that the issuance of the patents of the state at the date subsequent to the entry of the respondents in any manner terminated or concluded their rights. The legislature at the same session, and only a few days prior to the passage of the act, and in harmony therewith, declared, among other things, in an act to encourage mining, that any citizen of the United States, or person having declared his intention to become such, might enter upon any mineral lands in the state, notwithstanding the state's selection of it under the grants, and explore for gold, silver, copper, lead, cinnabar, or other valuable mineral, and, upon the discovery of any such mineral, might work and mine the same in pursuance of the local rules and regulations of the miners and the laws of the United States, provided that, after a person who has purchased lands from the state has made valuable improvements thereon, such improvements shall not be taken or injured without full compensation, but such improvements should be condemned for the uses and purposes of mining in like manner as private property is by law condemned and taken for public use.

It further declared mining to be of paramount interest and a public use. It still further declared that every contract, patent, or deed thereafter made by the state or its authorized agents should contain a provision expressly reserving all mines of gold, silver, copper, lead, cinnabar, or other valuable mineral that *may exist* in such land, and disclaimed for the state and its grantees any interest in mineral lands selected by the state on account of any grant from the United States. (Stats. 1887, 102; Comp. Laws 1900, 281, 282.)

The patent issued to the appellant contains the reservation

provided for in the act last cited; and without entering upon a discussion as to what, if any, limitation should be placed upon the construction of the clause of the statute providing for the reservation, it is sufficient to say that under the showing of the record the Hirsching lode was located, worked, and improved, and known to exist, before the patent of the state was issued, and, if this clause of the statute is to be applied to any case, it seems especially appropriate that it should be made to apply to the case at bar.

In other words, the state did not by its patent convey or attempt to convey the Hirsching lode. It did not terminate any rights of the respondents to the possession of the claim. It did not, under the facts of the case, divest or attempt to divest the respondents of any rights initiated by their location, work, and improvements made upon the claim; and it was proper in this action to set up and have determined their rights under these statutes.

By the terms of the statutes the respondents were lawfully in the possession of the mine, and lawfully entitled to the possession thereof. This right was not violative of any of the terms of the appellant's contract to purchase. It does not conflict with any of his rights under his patent, as defined by the statutes. If these statutes cannot be applied to the facts of this case, then they are nugatory. If they render unstable and have a tendency to unsettle titles, the remedy must be, if it can be, found in the legislative department. We do not make the laws. It is our duty to construe and apply them.

Error based upon the giving and refusal to give certain instructions is not properly before us. The instructions are not in the statement. No objection was made or exception taken to the action of the court in this matter. (*McGurn* v. *McInnis*, 24 Nev. 370.)

The other questions not waived are without merit.

The judgment and order appealed from are, for the reasons given, affirmed.