SOUTHERN DEVELOPMENT CO. v. ENDERSEN.

(District Court, D. Nevada. August 30, 1912.)

No. 1,080.

1. PUBLIC LANDS (§ 51*)—GRANT TO STATE—TITLE CONVEYED BY CERTIFICATION OF SELECTIONS—COLLATERAL ATTACK.

Rev. St. § 2449 (U. S. Comp. St. 1901. p. 1516), which gives to a list of lands selected by a state under a grant when approved and certified by the Land Department, the force and effect of a patent where the lands "are of the character contemplated by such act of Congress and intended to be granted thereby," but provides that, where they are not of such character, "the lists, so far as those lands are concerned shall be perfectly null and void, and no right, title, claim or interest shall be conveyed thereby," cannot be construed as leaving the title to lands so conveyed under a grant of nonmineral lands subject to perpetual doubt and to be defeated by a subsequent discovery of mineral thereon, but in all such cases it is the duty of the Land Department to ascertain the character of the land before certifying the lists, and its determination of that fact, where the land is public land of the United States, and has not been reserved or otherwise disposed of, and is therefore within the jurisdiction of the department is conclusive against collateral attack and against direct attack, unless on the ground of fraud, etc.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 138; Dec. Dig. § 51.*]

2. PUBLIC LANDS (§ 51*)—GRANT TO STATE—TITLE CONVEYED—COLLATERAL ATTACK—NONMINERAL—CHARACTER OF LAND—CONCLUSIVENESS OF DECISION OF LAND DEPARTMENT.

By Act June 16, 1880, c. 245, 21 Stat. 287, Congress granted to the state of Nevada 2,000,000 acres of land for school purposes, the act providing that the lands should be selected by the state authorities "from any unappropriated, nonmineral public land in said state—and when selected in conformity with the terms of this act the same shall be duly certified to said state by the commissioner of the General Land office and approved by the Secretary of the Interior." The lands were selected by the state and the lists duly approved, and certified by the Land Department with the approval of the Secretary. In 1883 the state sold and patented certain tracts which were afterward acquired by complainant. In 1908 defendant and his grantors located mining claims on the land in conformity with the mining laws of the United States. Held that, under the act, the duty of determining the character of the land selected, as to being mineral or nonmineral, devolved upon the Land Department as a condition precedent to the certification of the lists; that, when such certification was made, an unconditional title passed to the state; and that defendant could not show to defeat such title that the determination was erroneous as to such tract, and that it was in fact mineral.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 138; Dec. Dig. § 51.*]

In Equity. Suit by the Southern Development Company against Iven J. Endersen, otherwise known as Iven J. Endresen. Heard on bill and answer. Decree for complainant, subject to leave to defendant to amend answer.

Richard S. Miner, of Goldfield, Nev., and Lewers & Henderson, of Reno, Nev., for complainant.

Frank Hall, of Washington, D. C., and Mack & Green, of Reno, Nev., for defendant.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

FARRINGTON, District Judge. Complainant seeks to quiet its title to 320 acres of land in Esmeralda county, Nev. As the suit is heard on the bill and answer, the answer must be taken to be true in all respects.

It appears that the government of the United States, under an act of Congress approved June 16, 1880 (chapter 245, 21 Stat. 287), granted to the state of Nevada 2,000,000 acres of land, to be selected by the state authorities, and, when so selected, to be certified to the state by the Commissioner of the General Land Office, and approved by the Secretary of the Interior. Sections 2 and 3 of said act read as follows:

"Sec. 2. The lands herein granted shall be selected by the state authorities of said state from any unappropriated, nonmineral, public land in said state, in quantities not less than the smallest legal subdivision; and when selected in conformity with the terms of this act the same shall be duly certified to said state by the Commissioner of the General Land Office and approved by the Secretary of the Interior.

"Sec. 3. The lands herein granted shall be disposed of under such laws, rules, and regulations as may be prescribed by the Legislature of the state of Nevada: Provided, that the proceeds of the sale thereof shall be dedicated to the same purposes as heretofore provided in the grant of the sixteenth and thirty-sixth sections made to said state."

Nearly seven years before, the Legislature had passed an act approved March 5, 1873 (St. 1873, c. 64), providing for the selection and sale of lands which had been or thereafter might be granted to the state by the general government. The land in question was and is a part of the 2,000,000-acre grant. It was duly selected and listed by the Nevada state land register to the Commissioner of the General Land Office. Thereafter the Commissioner, with the approval of the Secretary of the Interior, approved and certified the selections and listing to the state of Nevada as nonmineral land. F. A. Magee, Helen J. Pomeroy, and G. W. Baker thereupon made application and payment for the land, and took such steps as were necessary under the Nevada statute. On the 30th day of March, 1883, patents were issued to them by the state of Nevada. The method provided by law for transferring title of the government to the state and for the acquisition of the state's title by the patentee were strictly pursued. Complainant has acquired by deed all the rights of patentees.

It is averred in the answer that the lands in question now are, and always have been, mineral lands; that long prior to 1880 they were embraced within a well-known and regularly established mining district; that they were conveyed by the Land Department of the United States to the state of Nevada without any examination or exploration by said department or its officers to determine whether they were mineral or nonmineral; that the appearance and geological formation of said lands clearly disclose their mineral character, all of which was well known to complainant before the conveyances were executed; that miners and prospectors were working in and upon this and adjacent lands, and had disclosed valuable mineral deposits thereon at the time of said conveyances.

200 F.—18

In 1908 and 1909 defendant and his grantors entered said lands, and made thereon seven mining locations. In making these locations the federal and state statutes were strictly followed. No question is raised as to the regularity of the locations except, in this: that they were laid on land selected, listed, certified, patented, and conveyed as above stated. Defendant does not attempt to connect himself with any title or claim prior to the locations in 1908.

Defendant contends that title did not pass to any mineral land under the patents, whether the mineral was known or unknown at the time of selection; that there was no authority in the departmental officers of the government to pass any title to mineral land; that mineral land was not within the terms of the grant to the state, or within the terms of any grant from the state to complainant's grantees, and was not subject to any claim or appropriation, or open to purchase except under the mining acts of Congress. The government conveys its title to public lands in various ways. The most usual method is by patent, following a procedure calculated to thoroughly inform the Land Department as to the character of the land, the identity of the grantee, and his right under the law to purchase. In other cases, as in the one at hand, where no provision is made for patent, and the lands are not identified in the grant, selection is necessary.

[1] The approval and certification to the grantee of a list of land so selected is the final act of transfer. In other cases, for example, the grant of the sixteenth and thirty-sixth sections of each township to the several states for educational purposes, there is no provision for either listing or patent. Such instruments are deemed unnecessary because Congress in the grant itself has identified the land conveyed with sufficient precision. Section 2449 of the Revised Statutes of the United States (vol. 6, Fed. Stats. Ann. 515 [U. S. Comp. St. 1901, p. 1516]) gives to a certified list, when it embraces land of the character contemplated by the act of Congress and intended to be conveyed thereby, the force and effect of a patent. This statute reads as follows:

"Where lands have been or may hereafter be granted by any law of Congress to any one of the several states and territories, and where such law does not convey the fee-simple title of the lands, or require patents to be issued therefor, the list of such lands which have been or may hereafter be certified by the Commissioner of the General Land Office, under the seal of his office either as originals or copies of the originals or records shall be regarded as conveying the fee simple of all the lands embraced in such lists that are of the character contemplated by such act of Congress, and intended to be granted thereby; but where lands embraced in such lists are not of the character embraced by such acts of Congress, and are not intended to be granted thereby, the lists, so far as these lands are concerned, shall be perfectly null and void and no right, title, claim, or interest shall be conveyed thereby."

From this statute the defendant concludes "that it was never intended that these listings should be conclusive as to the character of the land listed," and they convey no title to mineral land, whether the mineral was known or unknown at the time of selec-

tion. What, then, was the effect of the certified lists to the state of Nevada under the grant of June 15, 1880? If the listings are never conclusive as to the character of the land listed, obviously the mineral or nonmineral character of the land is always an open question. A title which to-day is valuable because the land is apparently nonmineral to-morrow may become utterly void and worthless by reason of the discovery of mineral. Methods of extraction and reduction may be devised of such cheapness and efficiency as to render mining highly profitable on lands which, at the date of selection and listing, had and could have had no value for mineral purposes. The courts have never yielded to the argument that Congress intended to provide for titles so elusive.

In Shaw v. Kellogg, 170 U. S. 312, 332, 18 Sup. Ct. 632, 641 (42 L. Ed. 1050), there was no patent. The transfer of title was evidenced by departmental approval of survey, field notes, and plat, and the fact that the land had been segregated from the public domain and had become private property was noted on the maps in the Land Department, and reported to Congress. Mr. Justice Brewer said:

"We say 'lands then known to contain mineral,' for it cannot be that Congress intended that the grant should be rendered nugatory by any future discoveries of mineral. * * * It would be an insult to the good faith of Congress to suppose that it did not intend that the title when it passed should pass absolutely, and not contingently upon subsequent discoveries. This is in accord with the general rule as to the transfer of title to the public lands of the United States. In cases of homestead, pre-emption or townsite entries, the law excludes mineral lands, but it was never doubted that the title once passed was free from all conditions of subsequent discoveries of mineral."

To the same effect, see Deffeback v. Hawke, 115 U. S. 392, 404, 6 Sup. Ct. 95, 29 L. Ed. 423; Roberts v. Southern Pacific Co., et al. (C. C.) 186 Fed. 934. In the last two cases there was an issue as to the validity of a United States patent in which occurred a reservation excluding all mineral lands from its operation, and a similar reservation was attempted in Shaw v. Kellogg, supra, but in each case the court held that the law authorized no such reservation, and that the Land Department could not in such a manner avoid its duty to determine the character of the land.

The following quotation is taken from Roberts v. Southern Pacific Co. et al., supra:

"The patent was the last step in the proceeding provided for by Congress, and was designed, as the statute expressly declares, to convey the government title to the grantee. Of what avail would such an instrument, intended for the peace and security of the holder, be if the antecedent facts upon which it is required to be based are open to subsequent inquiry and contestation by strangers to the title? As well might it be contended that questions of fact in respect to the marking of the boundaries of a patented mining claim or the previous discovery of mineral therein, or any other fact made essential by the statute to the issuance of a mining patent, are open to inquiry by the courts subsequent to its issue. In respect to such a contention this court said in the case of Doe v. Waterloo Mining Co. (C. C.) 54 Fed. 935, 940: 'If the rights conferred by the patent can be defeated by showing a want of parallelism of the end lines in the original location, it is difficult to under-

stand why the patent may not likewise be defeated by showing that the original location was void because its boundaries were not properly marked upon the ground, or because no vein, lode, or ledge was discovered within them, or because the statutory requirement in respect to the posting of the notice of location was not complied with, or because of an omission on the part of the locator to comply with any other provision of the statute regarding the location of such lode claims. All such matters I understand to be absolutely concluded by the patent so long as it stands unrevoked. If questions relating to the boundaries of the location, the marking of them, the discovery of a vein, lode or ledge within them, the posting of the required notice, etc., are open to contestation after the issuance of a patent for the claim as before, the issuance of such an instrument would be a vain act, and would wholly fail to secure to the patentee the rights and privileges designed by the law authorizing its issue. The very purpose of the patent is to do away with the necessity of going back to the facts upon which it is based.' "

Defendant argues thus:

"There was in fact no preliminary determination of the character of the land, and there was no provision for such determination either in the act of Congress granting the state 2,000,000 acres of land in lieu of the sixteenth and thirty-sixth sections (6 Fed. Stat. Ann. 481), nor in the act of the Legislature of 1873 (Stats. 1873, p. 120). Section 12 of the state act of 1873 permits the determination of the question of preferred right and prior occupancy only, but nowhere in the statute can be found any authority vested in the state officers to determine the character of the land as to whether it is mineral or nonmineral. To say that the character of the land was determined so as to render such determination final and conclusive is to say that a judgment may be rendered without any complaint being filed, without any notice or hearing, and without any legal power in the tribunal rendering the judgment to hear and determine the question involved."

Section 2395 of the Revised Statutes (U. S. Comp. St. 1901, p. 1471), of the United States ever since 1796 has required that:

"Every surveyor shall note in his field book the true situations of all mines, salt licks, salt springs and mill seats which come to his knowledge, * * * and also the quality of the lands. These field books shall be returned to the Surveyor General, who shall cause therefrom a description of the whole lands surveyed to be made out and transmitted to the officers who may superintend the sales."

The object of this provision was to furnish the Land Department with information as to the character of the land surveyed.

In Sutton v. State of Minnesota, 7 Land Dec. Dept. Int. 562, 564, the Secretary of the Interior said:

"The field notes of survey being entries in writing made by a public officer in the regular discharge of his duty are presumptively correct, and are prima facie evidence of the fact stated of a very high character. They must be taken as true, till disproved by a clear preponderance of the evidence."

For further authorities to the same effect, see note to Murray v. White, Ann. Cas. 1912A, 1315.

Section 2319 of the Revised Statutes (U. S. Comp. St. 1901, p. 1424), of the United States declares:

"All valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, are hereby declared to be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase."

Section 2406 (U. S. Comp. St. 1901, p. 1481), provides that "the public surveys shall extend over all mineral lands." Section 441 (U. S. Comp. St. 1901, p. 252) declares that the Secretary of the Interior is charged with the supervision of public business relating to the public lands, including mines. And section 453 (U. S. Comp. St. 1901, p. 257) provides that—

"the Commissioner of the General Land Office shall perform, under the direction of the Secretary of the Interior, all executive duties appertaining to the surveying and sale of the public lands," or in any wise relating to such lands.

[2] The grant to the state of Nevada, above quoted, declares that:

"When the land is selected in conformity with the terms of this act the same shall be duly certified to said state by the Commissioner of the General Land Office and approved by the Secretary of the Interior."

The duty of determining whether the lands were selected in conformity with the terms of the act was thus cast on the Land Department. Without its certification and approval no title could vest in the state. If the land was not of the character contemplated by the grant, it was the duty of the Secretary of the Interior to withhold his approval. It was never intended that this approval should be merely perfunctory, neither has the Land Department ever entertained such a conception of its powers and duties under this act. Since the case of Weeks v. Bridgman, 159 U. S. 541, 16 Sup. Ct. 72, 40 L. Ed. 253, the department has even recalled and vacated lists improvidently approved and certified, as in Scott v. State of Nevada, 26 Land Dec. Dept. Int. 629, and Manser Lode Claim, 27 Land Dec. Dept. Int. 326.

The provision of the statute is for certification and approval only when it is ascertained that selections have been made in conformity with the terms of the act; that is, from unappropriated nonmineral land in the state of Nevada. Clearly, the officers of the Land Department have jurisdiction to inquire into and determine these facts. The federal courts have always held that the Land Department has jurisdiction to determine the character of land. The patent or certification by which title is transferred from the government partakes of the nature of a judgment, and, in so far as it is a judgment, it is clothed with the invulnerability and conclusiveness of a judgment.

In every judicial proceeding there are questions to be answered which search the jurisdiction of the tribunal itself to ascertain whether there is power to pass on the merits of the controversy. In determining whether a judgment can be assailed collaterally, facts which go to the merits must be distinguished from those which go to jurisdiction. This distinction is thus clearly stated by Mr. Justice Brown in Noble v. Union River Logging Railroad Co., 147 U. S. 165, 174, 13 Sup. Ct. 271, 274 (37 L. Ed. 123):

"This distinction has been taken in a large number of cases in this court in which the validity of land patents has been attacked collaterally, and it has always been held that the existence of lands subject to be patented was

the only necessary prerequisite to a valid patent. In the one class of cases it is held that if the land attempted to be patented had been reserved, or was at the time no part of the public domain, the Land Department had no jurisdiction over it and no power or authority to dispose of it. In such cases its action in certifying the lands under a railroad grant, or in issuing a patent, is not merely irregular, but absolutely void, and may be shown to be so in any collateral proceeding. * * * Upon the other hand, if the patent be for lands which the Land Department had authority to convey, but it was imposed upon, or was induced by false representations to issue a patent, the finding of the department upon such facts cannot be collaterally impeached, and the patent can only be avoided by proceedings taken for that purpose * * * In French v. Fyan, 93 U. S. 169 [23 L. Ed. 812], it was held that the action of the Secretary of the Interior identifying swamp lands, making lists thereof and issuing patents therefor, could not be impeached in an action at law by showing that the lands which the patent conveyed were not in fact swamp and overflowed lands, although his jurisdiction extended only to lands of that class."

If the government does not own the land, if it has been previously conveyed, if it has been reserved from sale, or if there is no law providing for its disposal, and thus it has ceased to be or never was subject to sale, then the Land Department is without jurisdiction, its patent or certificate null and void, and this fact may be shown collaterally in any proceeding. In other words, if the department has no authority to sell, its conveyance is worthless. If the government owns the land and Congress has authorized its sale, then the question arises as to whether the land is of the character which the particular applicant may lawfully enter or select. This is a question of fact which the Land Department must answer, and its determination is conclusive. When such "a decision has been made by the Secretary of the Interior, courts will not entertain an inquiry as to the extent of his investigation and knowledge of the points decided, or as to the methods by which he reached his determination." De Cambra v. Rogers, 189 U. S. 119, 122, 23 Sup. Ct. 519, 521, 47 L. Ed. 734.

In Burfenning v. Chicago, St. Paul, M. & O. Ry. Co., 163 U. S. 321, 323, 16 Sup. Ct. 1018, 1019 (41 L. Ed. 175), Mr. Justice Brewer uses the following language:

"It has undoubtedly been affirmed over and over again that in the administration of the public land system of the United States questions of fact are for the consideration and judgment of the Land Department, and that its judgment thereon is final. Whether, for instance, a certain tract is swamp land or not, saline land or not, mineral land or not, presents a question of fact not resting on record, dependent on oral testimony; and it cannot be doubted that the decision of the Land Department, one way or the other, in reference to these questions is conclusive and not open to relitigation in the courts, except in those cases of fraud, etc., which permit any determination to be reexamined. * * * But it is also equally true that when by act of Congress a tract of land has been reserved from homestead and pre-emption, or dedicated to any special purpose, proceedings in the Land Department in defiance of such reservation or dedication, although culminating in a patent, transfer no title, and may be challenged in an action at law. In other words, the action of the Land Department cannot override the expressed will of Congress or convey away public lands in disregard or defiance thereof."

A large number of authorities have been cited, in which in actions at law the courts have set aside patents and certificates issued by the

Land Department because of the nonexistence of jurisdictional facts, without which the attempted conveyance of title from the government was a mere nullity.

For example, in Weeks v. Bridgman, 159 U. S. 541, 16 Sup. Ct. 72, 40 L. Ed. 253, lands previously entered under the pre-emption act were certified to the state of Minnesota for railroad purposes. The certificate was held void in an action brought under the statute of Minnesota to determine adverse claims to unoccupied and vacant real estate. The certificate was ineffectual because the land had already been disposed of to the pre-emptioner.

Patterson v. Tatum, 3 Sawy. 164, Fed. Cas. No. 10,830, was an action to recover possession of real estate. The plaintiff claimed under a patent from the state of California lands selected by the state under the 500,000-acre grant from the general government. Plaintiff's title was held bad, because the tract demanded, before its selection by the state, had been reserved from sale under a grant to the Central Pacific Railroad Company. It was held the fact that the government at the time the land was listed and approved to the state had no authority to convey because the land had already been reserved was admissible in evidence in an action of ejectment.

McLaughlin v. Menotte, 89 Cal. 354, 26 Pac. 880, was an action in ejectment. Plaintiff claimed the land under a railroad grant. Defendant rested his claim on a subsequent selection by, and approval to, the state of California as lieu school land. It was held that the later conveyance must give way to the earlier.

Sutton v. Fassett, 51 Cal. 12, also was an action in ejectment. The plaintiff claimed under patent from the United States issued in 1873. Defendant claimed under a patent issued by the state in 1867. The title of the state was derived from the government under an act of 1866, which granted to the state "lands which had been segregated as swamp and overflowed land by the state, the surveys and maps of which shall be found to conform to the surveys made by the United States." The court held that the state had acquired no title because it did not appear that the lands had been segregated as swamp land before the passage of the act, consequently the Commissioner of the General Land Office had no authority to certify the tract in dispute to the state.

Leavenworth, etc., R. R. Co. v. United States, 92 U. S. 733, 23 L. Ed. 634, differs from the cases already discussed, in this: That it was a suit in equity by the United States itself to establish its title to certain tracts of land in the Osage country, Kan., and to enjoin the defendant railroad company from setting up any claim thereto. This was a direct attack on the patent. The lands in question had been certified by the Commissioner of the General Land Office, with the approval of the Secretary of the Interior, to the state of Kansas, and by the latter conveyed to the railroad company. It was held that the certification and approval conveyed no title, because the land had been previously, by treaty, reserved for the Osage Indians.

In Stokes v. Pensacola & Georgia R. R. Co., 24 Land Dec. Dept.

Int. 396, a tract of land situated in Alabama had been certified to the state of Florida in aid of the railroad. Years after Stokes entered the tract as a homestead. The land was wholly outside the limits of the grant to the state, and hence not of the character intended to be granted by Congress. The Secretary of the Interior held that the certification was so absolutely null and void that a suit to recover the land was unnecessary.

In Morton v. Nebraska, 21 Wall. 663, 675 (22 L. Ed. 639), the issue was the validity of a patent under the pre-emption act, which declares that:

"No lands on which are situated any known salines or mines shall be liable to entry under and by virtue of the provisions of this act."

The land was saline land, and so noted on the field books of the government surveyor. The court said:

"The executive officers had no authority to issue a patent for the lands in controversy, because they were not subject to entry, having been previous-ly reserved, and this want of power may be proved by a defendant in an action at law."

Thus the records in the Land Office, at the very time proceedings were there had, disclosed the fact that the lands were saline, and the patent was thus issued in defiance of an established and recorded fact.

In Ivanhoe Mg. Co. v. Keystone Mg. Co., 102 U. S. 167, 26 L. Ed. 126, plaintiff held a patent from the state of California issued under the congressional act of March 3, 1853, granting the 16th and 36th sections of every township to the state for school purposes. The land was applied for in 1870, and the state patent issued in 1872; but it was shown that in 1850 the tract described in the patent was occupied by the city of Amador. Three mining claims were located thereon— one in 1851, one in 1853, and one in 1863. The original locators and their grantees had been in possession ever since, and until the commencement of suit. In 1873 patents were issued by the government to the defendants for these mining claims. The land was not surveyed until 1870. The court held that the land was not subject to the school grant because it was mineral, occupied, and cultivated before survey, and well known to be so when the surveys were made, consequently the lands did not pass to the state under the school land grant. The equitable title to the land had already vested in the city and the mineral locators.

In each of the foregoing cases it was possible to show that the transfer from the government was inoperative by showing the nonexistence of some jurisdictional fact, without assailing any adjudication that the land was of the character contemplated by law.

The following cases show how the rule is applied when in a collateral proceeding there is an attempt to inquire into the character of the land, after that fact has been passed on by the Land Department:

Buena Vista Petroleum Co. v. Tulare Oil & Min. Co. (C. C.) 67 Fed. 226, presents a situation very similar to that now under consideration. It was a suit to quiet title to lands which had been selected by the state of California, approved by the Land Department, certified

and listed by the Secretary of the Interior to the state under the 150,-000-acre grant in aid of agricultural colleges. The land had been patented to the complainant by the state. The act expressly excluded all mineral land from the grant. Subsequent to the issuance of the patent placer mining claims were located on the land by the defendant. The answer alleges that the lands are, and were at all times, mineral lands, and never were agricultural. The case was heard on plaintiff's exceptions to the answer. The controlling, and in fact, the only question submitted to the court, was—

"whether the listing and certification of the lands in question to the state is a conclusive determination that the character of the lands was such as brought them within the terms of the grant, or whether the defendants are, in this suit, entitled to show that the lands in controversy were, at the time they were so listed and certified, and since have been, mineral in character, and therefore excluded from the grant to the state."

Judge Ross argued that the certified list was the same, in effect, as a patent, and the decision of the Land Department as to the character of the land necessarily embodied in the act of approval and certification was conclusive, and could not be questioned collaterally in an action involving title to the land. Referring to Chandler v. Mining Co., 149 U. S. 79, 13 Sup. Ct. 798, 37 L. Ed. 657, Judge Ross says:

"The Supreme Court held that there had been such affirmative action on the part of the Department of the Interior as constituted a conclusive determination in respect to the character of the land, and that parol evidence on the part of the plaintiff to show that the particular tract was swamp in character, and therefore embraced by the swamp land grant to the state, was inadmissible. This ruling clearly controls a case like the present, where the lands in controversy were selected by the state as being within the grant to it, the selection approved by the Secretary of the Interior, and the certified list issued to the state pursuant thereto."

In Van Ness v. Rooney, 160 Cal. 131, 116 Pac. 392, there was a valid location of a mining claim made August 26, 1895, which was duly conveyed to the plaintiff Van Ness. The same land was later (February 14, 1896) patented to the Central Pacific Railroad Company. Van Ness brought suit to quiet title. The court held that as there was a discovery of a valuable mineral deposit followed by a valid location, notice of which was recorded in the usual books of record within the district, the land had become known mineral land, and the equitable title thereto had passed to the complainant and to his grantors before patent issued to the railroad company. Consequently the government held the legal title in trust for complainant to issue to him a patent therefor upon his complying with the provisions of the law entitling him to such issuance. The government could not convey by patent to the railroad company land which had already passed to the mineral locators.

United States v. Northern Pacific Ry. Co. (C. C.) 170 Fed. 498, and 176 Fed. 706, 101 C. C. A. 117, was a suit brought by the government to annul a patent theretofore issued by the government. It was a direct, and not a collateral, attack, and consequently is not in point.

Shaw v. Kellogg, 170 U. S. 313, 18 Sup. Ct. 632, 42 L. Ed. 1050,

is very closely in point. In settlement of an old Mexican grant Congress passed an act granting the claimants "an equal quantity of vacant land not mineral in the territory of New Mexico to be located by them." It was also provided that the Surveyor General of the territory, when required by the claimants, should survey and locate the lands so selected. Some question arose as to the character of the land. This led the Land Department to instruct the Surveyor General that the character of the location as to mines must be carefully ascertained, and that the selections could not be approved unless accompanied by certificates of the register and receiver of the local land office that the land is vacant and nonmineral. The Surveyor General, under direction of the Land Department, subsequently approved the selections and made survey and location. The Land Department approved the survey, field notes, and plat. The parties were notified thereof, but no patent was issued because Congress had made no provision for patent. It was noted in the records of the Land Department that the land had been segregated from the public domain. To this approval the Land Department added these words:

"Subject to the conditions and provisions of section 6 of the act of Congress approved June 21, 1860."

This provision excluded mineral land from the grant. This fact was reported to Congress. The grantees entered into possession of the tract, fenced it, and paid taxes thereon. Years after a portion of the tract was entered and occupied as mineral land. The owners of the grant brought an action in ejectment. The defendant contended that Congress "granted only nonmineral lands; that this particular tract is mineral land, and therefore by the terms of the act is not within the grant; that no patent has ever been issued, and therefore the legal title has never passed from the government; that the Land Department never adjudicated that this was nonmineral land, but, on the contrary, simply approved the location, subject to the conditions and provisions of the act of Congress, thereby leaving the question of title to rest in perpetual abeyance upon possible future discoveries of minerals within the tract."

The Supreme Court held that it was the duty of the Land Department to determine the character of the land, that it could not avoid or evade that duty by saying that it approved the locations, provided no mineral should thereafter be discovered, and disapproved them if such discovery should be made. It could not require the grantees to take chances on the future discovery of minerals. It was a question for its action at the time. The attempted exception in the approval was without authority of law, and therefore ineffectual. The Surveyor General, the register, and receiver each certified the lands to be nonmineral. These certificates were their decision. There was no appropriation for actual exploration of the land. The action of the Land Department was a finality, and passed the title free from the contingency of future discovery of

minerals. In reply to the contention that no patent has issued, and consequently the character of the land remained an open question, the court said:

"There is no magic in the word 'patent,' or in the instrument which the word defines. By it the legal title passes, and, when by whatsoever instrument and in whatsoever manner that is accomplished, the same result follows as though a formal patent were issued."

The law made no provision for a patent. The grantees—

"had no alternative but to accept that which the statute had provided as the means of acquiring and the evidence of title, and that must be treated as having all the efficacy of a patent. * * * We are of opinion that at this late day the title of the locators and their grantees is not subject to challenge, and that it is a full, absolute, and unconditional title."

A comparison of the act creating the grant involved in Shaw v. Kellogg with the language used in the 2,000,000-acre grant to Nevada does not show any greater duty to examine and explore for mineral in one case than in the other. There was in each a survey under authorization of the government. The law since 1796, as quoted above, has required the surveyor to record in his field notes all mines. The fact there was or there was not an examination for mineral does not affect the jurisdiction of the Land Department to determine the character of the land, though it may have much to do with the correctness of the conclusion.

Chandler v. Mining Co., 149 U. S. 79, 13 Sup. Ct. 798, 37 L. Ed. 657, was an action in ejectment. Each party held a patent from the state of Michigan for the 40-acre tract in controversy. Plaintiff's patent, dated 1887, described the tract as swamp land, and was based on the Swamp Land Act of September 28, 1850 (Act Sept. 28, 1850, c. 84, 9 Stat. 519), but the tract was never embraced in any list of swamp lands certified by the Secretary of the Interior to the state, though such lists included tracts in the immediate vicinity of the 40 acres in question. Defendant's patent, dated 1855, was based on a congressional act of 1852, granting Michigan 750,-000 acres from any land in that state subject to private entry in aid of a canal project. Under the act of 1852, the tract in controversy was selected by the agents of the state. The selection was by the Secretary of the Interior approved to the state in 1855, and in the same year the state issued defendant's patent. The Supreme Court held that the action of the Land Department operated as an adjudication of the character of the land, and parol evidence to the effect that the land in dispute was in fact swamp land, and therefore embraced in the swamp land grant to the state, was properly excluded.

I conclude, therefore, if the lands listed to the state of Nevada as agricultural land were in fact mineral land, and not of the character contemplated in the act, still the listing was in effect a judgment by the Land Department in relation to matters over which it had jurisdiction. As a judgment it cannot be assailed collaterally. The listing can be reversed, set aside, or annulled in a direct action brought for that purpose. Inasmuch as the defendant's

rights, as alleged in the answer, did not accrue until 1908, more than 20 years after the land was listed to the state, he is not in a position to attack the title. He had no rights at the time to be affected by any fraud on the part of the plaintiff and its grantors, or by any mistake or inadvertence on the part of the Land Department. Carter v. Thompson (C. C.) 65 Fed. 329, 331. At that time the only parties in interest were the United States and the state of Nevada. The land belonged to the government. The government had full power to convey. It had never in any manner bound itself to hold this land for the benefit of defendant, nor was there any trust relation between plaintiff and defendant. Defendant cannot challenge the validity of the listing to the state on the ground the selection was not of the character contemplated in the grant. Such action can only be brought in the name of the United States. Standard Quicksilver Co. v. Habishaw, 132 Cal. 115, 64 Pac. 113, 115; Peabody Gold Min. Co. v. Gold Hill Min. Co., 111 Fed. 819, 821, 49 C. C. A. 637; Deweese v. Reinhard, 165 U. S. 386, 391, 17 Sup. Ct. 340, 41 L. Ed. 757; Sparks v. Pierce, 115 U. S. 408, 412, 6 Sup. Ct. 102, 29 L. Ed. 428. Patents were issued by the state to plaintiff's grantors at a time when there was a Nevada statute reading thus:

"All timber and mountainous grazing land *hereafter selected by and listed to* the state of Nevada under any grant made by the United States to this state, *shall be sold, reserving the minerals therein contained and the right to dispose thereof."*

This statute was passed March 1, 1883. It was repealed March 12, 1885, and was replaced by no act of like import until March 3, 1887, when the Legislature (Stats. 1887, p. 102; Rev. L. of Nev. §§ 2456, 2457) provided that:

"Every contract, patent or deed hereafter made by this state or the authorized agents thereof, shall contain a provision expressly reserving all mines of gold, silver, copper, lead, cinnabar and other valuable minerals that may exist in such land, and the state, for itself and its grantees, hereby disclaims any interest in mineral lands heretofore or hereafter selected by the state on account of any grant from the United States. * * *"

The statute of 1887 was carefully considered by the Supreme Court of Nevada in Stanley v. Hirschberg, 26 Nev. 55, 63 Pac. 59. That was an action in ejectment. After plaintiff had entered into contract with the state of Nevada for the land, but before patent issued, defendant located a mining claim thereon, and expended $40,000 in development work and improvements. It was argued that the approval and selection of the land under the 2,000,000-acre grant by the proper officers of the government was a conclusive determination that it was nonmineral, and therefore an attack involving its character could only be made in a direct proceeding instituted for that purpose. The court declared that, while the determination was probably conclusive as against a subsequent discovery of mineral, it did not follow that the state must under the grant convey the same title which it had received. The disposal of the land was left to the judgment and wisdom of the state.

The state by law had opened such land to the prospector, and had also provided that in every deed or patent issued by the state mines of gold, silver, copper. lead, cinnabar, or other valuable minerals that may exist in such land should be expressly reserved. Stanley's patent from the state contained such a reservation. The mine was located and known to exist before patent issued. The patent neither conveyed nor attempted to convey the mine, and consequently the state had not parted with its title thereto. Defendant's possession and occupation of the mine violated none of plaintiff's rights under his contract to purchase from the state.

In Rhodes v. Belleville Placer Min. Co., 32 Nev. 230, 106 Pac. 561, 118 Pac. 813, it was admitted that mining claims might be located and held on lands previously conveyed by the state of Nevada, if the patent contained the reservation provided for in the act of March, 1887.

The act of 1887 is much broader than the act of March, 1883. The later act provides that every state patent shall expressly reserve all mines. The act of 1883 did not apply to all lands sold by the state, but to "timber and mountainous grazing lands" only. Furthermore, it did not include "all timber and mountainous grazing lands," but only such as might thereafter—that is, after March 1, 1883—be selected by and listed to the state of Nevada. Such lands the statute says "shall be sold, reserving the minerals therein contained, and the right to dispose of mining claims on such timber and mountainous grazing lands in the manner prescribed by the laws of Congress in relation to the disposal of mineral lands and mining claims, and such reservation and right of disposal shall be expressed in all patents hereafter granted and issued by the state for such timber and mountainous grazing lands to purchasers thereof from the state."

In section 2 of the act the state reserves to itself the right to convey such mining claims.

That act has no application to the facts set out in the pleadings. Plaintiff's patents were issued March 30, 1883, 29 days after the act was approved. The patent contained no reservation of mineral, no reservation of a right in the state to dispose of mining claims then known or which might be thereafter discovered on the land conveyed. In the pleadings there is no allegation that the lands sold were "timber or mountainous grazing lands," or that they had been selected by and listed to the state subsequent to March 1, 1883, the date of the act. My attention has been called to no other statute in force, while plaintiff's grantors were acquiring title from the state. which requires me to read into the patent any exception or reservation of mineral or mining ground which may exist within the tracts described in the patents. If the lands were selected and approved to the state. after the date of the act, then we must conclude that the state officials. who were charged with the administration and disposal of state school lands granted to the state by the general government, determined that the lands in question were neither "timber nor mountainous grazing lands." This conclusion,

when evidenced by patent, is in effect a judgment. It is no less conclusive as to questions of fact than is a patent issued by the general government. Saunders v. La Purisima Gold. Min. Co., 125 Cal. 159, 57 Pac. 658.

Garrard v. Silver Peak Mines (C. C.) 82 Fed. 578, is much relied on by defendant. The plaintiff there claimed 40 acres under a patent issued by the state of Nevada for lands selected, listed, and approved under the 2,000,000-acre grant. The date of the grant was June, 1880. The land was not listed by the government until August 7, 1880. Plaintiff's patent was not issued by the state until June 29, 1891. About May 1, 1879, and before the grant was made by Congress, a portion of the 40 acres had been patented as a mill site, and a mill costing many thousands of dollars had been erected thereon. In 1865 the defendant's grantors had located the whole tract under a Nevada statute providing for the location of lands containing salt. In 1888, before the land was listed to the state, a quartz ledge containing gold and silver was discovered and located on the land. This claim was subsequently deeded to defendant. The Circuit Court of Appeals (94 Fed. 983, 990, 36 C. C. A. 603), in briefly summarizing its reasons for sustaining the lower court, says:

"The facts shown by the record make it clear that the patent under which the plaintiff claimed was not only not authorized, but was prohibited, by the statutes of the very state whose patent it purports to be, first, because it was issued for known mineral land; and, next, because the land for which it was issued then was, and for many years prior to the application therefor had been, in the actual occupation of another under a claim of right. That a patent issued without authority of law may be impeached collaterally in a court of law is thoroughly settled."

In the lower court Judge Hawley took the view that there were exceptions to the rule exempting a patent from collateral attack, that extrinsic evidence may be admitted to show that a patent issued with all the forms of law, was issued without authority, and that questions of fact arising in the administration of the public land system are for the consideration of the Land Department, and its judgment thereon is final. The plaintiff, before he acquired an interest in the property, knew that a portion of the land had been patented by the general government prior to the date of the state's selection, and that defendant was in actual possession and had erected on the land a 30-stamp quartz mill.

This case differs in a very marked degree from the one at bar. In the Garrard Case the discovery of mineral and the location of the land and the mill site patent for a portion of it antedated any selection or attempted selection by the state. In the present case the location of the mining claims was more than 20 years after the state selection, and the date of the state's patent to plaintiff's grantors.

The great difference, however, between the two cases is in the fact that the statute of March 3, 1887, was in force when Garrard's grantees acquired their patent.

At the time this cause was submitted the parties stipulated that in case the answer here should be held insufficient, in whole or in part,

defendant might then at his option amend his answer in any respect, and for that purpose should have 15 days after decision. The answer is insufficient to constitute a defense; therefore, if defendant cares to amend his answer, he will be permitted to do so, and for that purpose will be allowed 20 days after notice of this decision. If he fails to amend within that time, a decree will be entered in favor of complainant in accordance with the views herein expressed.